[No. D042950. Fourth Dist., Div. One. June 1, 2005.]

HUNTINGDON LIFE SCIENCES, INC., et al., Plaintiffs and Respondents,
v.
STOP HUNTINGDON ANIMAL CRUELTY USA, INC., et al., Defendants and Appellants.

1232

1234

1236

**COUNSEL**

Shannon Keith and Orly Degani for Defendants and Appellants.

Laturno & Graves and David W. Graves for Plaintiffs and Respondents.

## OPINION

**McCONNELL, P. J.**—This is an action for trespass, harassment under Code of Civil Procedure[1] sections 527.6 and 527.8 and related causes of action arising from incidents at the home of plaintiff Claire Macdonald, an employee of plaintiff Huntingdon Life Sciences, Inc. (HLS), an animal testing laboratory. Defendants Stop Huntingdon Animal Cruelty USA, Inc. (SHAC USA), Kevin Kjonaas and David Agranoff appeal an order denying their special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute. (§ 425.16.)

Contrary to plaintiffs' contention, we conclude the complaint arises from protected speech within the meaning of section 425.16. As to SHAC USA and Kjonaas, we affirm the order as to plaintiffs' cause of action for harassment, as they showed a probability of prevailing thereon. Considering the factual context and all the circumstances, certain entries SHAC USA published on its Internet Web site constituted a " 'credible threat of violence' " within the meaning of sections 527.6, subdivision (b)(2) and 527.8, subdivision (b)(2).

We also affirm the order as to Macdonald's causes of action against SHAC USA and Kjonaas for intentional infliction of emotional distress and invasion of privacy, as she showed a probability of prevailing on those claims. As to Macdonald's unfair competition cause of action (Bus. & Prof. Code, § 17200 et seq.) against those defendants, we affirm the order insofar as it concerns her individual claim, as she showed a probability of prevailing thereon. We direct the court to grant defendants judgment on the pleadings insofar as the representative portion of the cause of action is concerned, as it is precluded by Proposition 64's amendments to the unfair competition law (as approved by voters, Gen. Elec. (Nov. 2, 2004)). We reverse the order insofar as it concerns the remaining causes of action against SHAC USA and Kjonaas, and HLS's unfair competition cause of action against them based on Proposition 64.

As to Agranoff, who admittedly picketed at Macdonald's home, we affirm the order as to her cause of action against him for violation of San Diego Municipal Code section 52.2003. We reverse the order insofar as it concerns the remaining causes of action against him and HLS's claim against him under the Municipal Code.

Further, we reverse the preliminary injunction in part for overbreadth, and direct the court on remand to reconsider provisions related to SHAC USA's Internet Web site. Additionally, we direct the court to consider defendants' request for attorney fees.

---

[1] Statutory references are to the Code of Civil Procedure unless otherwise specified.

## FACTUAL AND PROCEDURAL BACKGROUND

HLS is a British company with United States headquarters in New Jersey. HLS provides research services to pharmaceutical and chemical companies, and in doing so it conducts testing on various types of animals, including mice, rats, dogs, monkeys and rabbits.

In 1999 the entity Stop Huntingdon Animal Cruelty was launched in England with, according to HLS, the stated purpose of forcing HLS's closure. Kjonaas, SHAC USA's president, formed that entity in 2000 with the shared goal of forcing HLS's closure.

SHAC USA's Web site "advocates protest against HLS, its shareholders, employees, clients and supporters, [and] lists the names, addresses and telephone numbers of some of these entities and individuals." SHAC USA "makes no secret that it supports illegal acts of civil disobedience, including those that involve property damage, so long as no human or animal is harmed." For instance, "SHAC USA openly approves of and supports the activities of the Animal Liberation Front (ALF)," a radical animal rights organization whose members engage in illegal acts such as trespassing and the destruction of property.

Macdonald is an HLS employee who lives in San Diego. SHAC USA and Kjonaas do not deny SHAC USA's Web site specifically targeted her for protest activity. In the early morning of March 28, 2003, red paint was dumped on the driveway of her home and on her husband's car, three of the car's tires were punctured and "HLS SCUM" was painted on the garage in blue spray paint. Afterward, Macdonald took precautionary measures, such as having motion lights and cameras installed at her home to provide 24-hour surveillance.

In the early morning of May 3, 2003, three persons dressed in dark clothing with their faces covered rang Macdonald's doorbell and set off a siren. The persons then stood at the end of her driveway and shouted through megaphones, " 'Claire Macdonald is a murderer.' " The persons had departed by the time police arrived.

The following day SHAC USA published on its Web site a report of the May 3 incident, which included Macdonald's home address. The entry, which said it was "[r]eceived anonymously from CA [California] activists," (italics omitted) read: " 'Activists paid a late night visit to the home of Claire Mac[d]onald, employee of HLS. Using multiple megaphones, we reminded Claire [that] 500 animals die each day because of her wicked ways. We informed all her neighbors that a puppy killer lives at [street address].' " The

entry included the following message: " 'To [Macdonald's] neighbors: We are sorry you live near such a scumbag. We know she is an embarrassment to the neighborhood. We certainly understand if you would like to join us in encouraging [her] to move. Puppy killer leave town!' "

The evening of May 25, 2003, three persons wearing dark clothing with their faces covered approached the front of Macdonald's home and one of them rang her doorbell continuously for several seconds. Those persons then joined about 15 to 20 other persons lined up on the sidewalk adjacent to her home. Many of the persons were holding candles, but others were holding posters that read " 'puppy killers' " and "contained graphic pictures." Several other persons "were canvassing the neighborhood putting flyers in mailboxes and on car windshields."

SHAC USA published a report of the May 25 incident, again attributed to California activists, on its Web site. The report read:

" '20 black-clad activists wearing balaclavas descended upon the home of Claire Mac[d]onald, located at [street address]. Claire is an HLS employee who is able to pay for her gigantic house by promoting the torture and murder of animals at HLS.

" 'So the activists showed their disgust for Claire and sympathy for the animals by silently standing in a straight line in front of her house with tall, red candles. Some neighbors came out to ask why Claire keeps getting visitors, and one threw a beer bottle at her house! Activists were entertained by the commotion, but remained silent and focused on the animals dying for Claire's extravagance. We weren't sure if she was home because all the lights were out, but when the cops finally came (it took these jokers over 20 minutes to get there!) she opened up the door, reassuring us that she was home and watching us through the peephole.

" 'A message for Claire: tonight 250 flyers were distributed in your neighborhood alerting your neighbors that you're a vicious animal abuser. You've already been hit by the ALF[2], you've already gotten early morning wake-up calls, you have masked activsts [sic] protesting in front of your home, your censor [sic] lights are a joke, the cops are too slow to get there within a reasonable time, and thousands of activists know where you live. What's it going to take for you to quit HLS?' "

---

[2] Plaintiffs produced evidence that the day after the March 28, 2003 vandalism at Macdonald's home, the Web site "www.directaction.info," which gives the name "Bite Back" and an address in West Palm Beach, Florida, published an account of the vandalism, which it reportedly received anonymously from "US activists." The message was signed " 'A. L. F.' "

In June 2003 Macdonald and HLS sued SHAC USA, Kjonaas, ALF and Agranoff for trespass, harassment under section 527.6,[3] intentional and negligent infliction of emotional distress, invasion of privacy, intentional and negligent interference with prospective economic advantage, violation of California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.) and violation of San Diego Municipal Code section 52.2003. Plaintiffs sought injunctive relief, attorney fees and costs.

Plaintiffs moved ex parte for a temporary restraining order. They submitted the entries SHAC USA published on its Web site regarding the May 3 and 25 incidents at Macdonald's home among other evidence. Regarding Agranoff, plaintiffs submitted a document entitled "San Diego Regional Officer's Report Narrative," which stated an officer stopped Agranoff's car as he was driving away from the area of Macdonald's home after the May 25 demonstration because a brake light was out. Three passengers in Agranoff's car wore ski masks.

In opposition to the request for injunctive relief, Kjonaas submitted a declaration that stated SHAC USA displays the following disclaimer on every page of its Web site: "The SHAC USA website, its designers, and contributors are not responsible for actions on the part of any individual which proves defamatory, injurious, or prejudicial to the individuals or entities named herein, their families, or acquaintances. This website is provided for informational purposes only, and is not intended to incite any criminal action on the part of its viewers."

The declaration also stated Kjonaas had not visited San Diego for more than 10 years, and he had never contacted Macdonald or any other HLS employee residing in California by phone, e-mail, fax, or letter. Further, the declaration stated Kjonaas "never had access to or knowledge of any information about . . . Mac[d]onald besides what has been posted on the SHAC USA news website."

The court issued a temporary restraining order against all defendants. Shortly thereafter, they brought a special motion to strike the complaint under the anti-SLAPP statute. (§ 425.16.) Defendants submitted declarations of Kjonaas, and a declaration of Agranoff, in which he denied any association with ALF and stated he was "near" Macdonald's home on May 25, 2003, and he "held a candle in silence for about an hour."

---

[3] The complaint does not cite section 527.8, but as discussed later, it is fairly construed to include a cause of action under that statute by HLS.

The court issued a preliminary injunction against HLS and Kjonaas. The injunction did not include ALF and Agranoff because the court found no evidence they were served with the summons and complaint or the temporary restraining order and order to show cause.[4] The court found good cause to believe SHAC USA and Kjonaas "have engaged in, are engaging in, and are about to engage in acts, practices, and conduct that constitutes violations of plaintiff's right to privacy and which constitutes trespass, infliction of emotional distress, and violations of San Diego Municipal Code [section] 52.2003."

The preliminary injunction prohibits SHAC USA and Kjonaas from coming within 100 feet of any real property of any HLS employee; coming within 100 feet of any HLS employee or his or her family member, friend or business associate; placing or maintaining on any Web site any information regarding any HLS employee, family, friend or business associate; telephoning any HLS employee; e-mailing HLS or any HLS employee; attempting to block the Web site, e-mail, facsimile lines or telephone lines of HLS or any HLS employee; trespassing on or vandalizing the property of Macdonald or any other HLS employee; harassing or stalking Macdonald or any other HLS employee; engaging in picketing at a residence owned or in the possession of Macdonald or any other HLS employee; and violating San Diego Municipal Code section 52.2003.

The court later denied defendants' special motion to strike, explaining that even assuming the complaint arises from their protected speech, plaintiffs "have obtained injunctive relief which necessarily included a determination [plaintiffs] had shown a likelihood of prevailing on the merits of their claims." This appeal of the order on the anti-SLAPP motion ensued.

## DISCUSSION

### I

### The Anti-SLAPP Statute

In 1992 the Legislature enacted section 425.16, known as the anti-SLAPP statute, to allow a court to dismiss certain types of unmeritorious claims at an early stage in the litigation. (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1159 [15 Cal.Rptr.3d 100].) Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of

---

[4] We have reviewed the superior court file (see Cal. Rules of Court, rule 12(a)(1)(A)) and note that service of the summons and complaint on ALF was achieved through publication, and in July 2004 a default was entered against it. ALF is not involved in this appeal.

the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

■ In deciding an anti-SLAPP motion, the trial court must "engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

■ A defendant may meet his or her burden by showing the act underlying the plaintiff's cause of action fits one of the categories enumerated in section 425.16, subdivision (e). (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].) As used in that provision, a protected act includes ". . . (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

■ "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech." (*City of Cotati v. Cashman, supra,* 29 Cal.4th at p. 78.) "The anti-SLAPP statute's definitional focus is not the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

■ "[T]o establish a probability of prevailing on the claim [citation], a plaintiff responding to an anti-SLAPP motion must ' "state[] and substantiate[] a legally sufficient claim." ' [Citations.] Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.] In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant [citation];

though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) The "plaintiff 'cannot simply rely on the allegations in the complaint.' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1010 [113 Cal.Rptr.2d 625] (*ComputerXpress*).)

■ The court's ruling on a special motion under section 425.16 is subject to our independent review. (*Annette F. v. Sharon S., supra,* 119 Cal.App.4th at p. 1159.)

II

*The Complaint Arises from Protected Speech*

A

■ Each of the causes of action here includes the allegation that on March 28, 2003, defendants vandalized Macdonald's home and her husband's car. Vandalism, of course, is not a legitimate exercise of free speech rights, and if the complaint arose only from such conduct it would not be subject to an anti-SLAPP motion. Each cause of action, however, also alleges protected activity such as SHAC USA's encouragement of demonstrations against animal testing and support of "those who choose to operate outside the confines of the legal system." Indeed, the gravamen of the action against defendants here is based on their exercise of First Amendment rights.

■ "Published appellate court cases have concluded that where a cause of action alleges both protected and unprotected activity, the cause of action will be subject to section 425.16 unless the protected conduct is 'merely incidental' to the unprotected conduct." (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 103 [15 Cal.Rptr.3d 215].) ■ The California Supreme Court is currently reviewing this issue (*Kids Against Pollution v. California Dental Association,* review granted Sept. 17, 2003, S117156), but pending its decision we follow the existing appellate precedent that the anti-SLAPP statute applies to a mixed cause of action. (*Mann v. Quality Old Time Service, Inc., supra,* at p. 103.)

B

■ Plaintiffs contend this is not a SLAPP suit because they merely seek to enjoin illegal activity such as trespass. Mere allegations that defendants

acted illegally, however, do not render the anti-SLAPP statute inapplicable. For instance, the First Amendment does not protect defamation, yet defamation suits are a prime target of anti-SLAPP motions. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 305 [106 Cal.Rptr.2d 906].) "The Legislature did not intend that . . . to invoke the special motion to strike the defendant must first establish her [or his] actions are constitutionally protected under the First Amendment as a matter of law. If this were the case then the inquiry as to whether the plaintiff has established a probability of success would be superfluous." (*Ibid.*) "When a cause of action arises from constitutionally protected speech, section 425.16 applies and the question of whether the speech is [not protected] must be examined when plaintiff demonstrates a probability of success on the merits." (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 420 [9 Cal.Rptr.3d 242].)

 If the defendant *concedes* or the evidence *conclusively establishes* the conduct complained of was illegal, as a matter of law the defendant cannot make a prima facie showing the action arises from protected activity within the meaning of section 425.16. (*Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356, 1367 [102 Cal.Rptr.2d 864], disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 459 [125 Cal.Rptr.2d 534].) Defendants, however, have not conceded they committed any illegal acts, and we conclude that with a minor exception the evidence does not show illegality *as a matter of law.*[5]

 The "public interest" component of section 425.16, subdivision (e)(3) and (4) is met when "the statement or activity precipitating the claim involved a topic of widespread public interest," and "the statement . . . in some manner itself contribute[s] to the public debate." (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 [17 Cal.Rptr.3d 497].) "Commenting on a matter of public concern is a classic form of speech that lies at the heart of the First Amendment." (*Annette F. v. Sharon S., supra,* 119 Cal.App.4th at p. 1162, citing *Schenck v. Pro-Choice Network* (1997) 519 U.S. 357, 377 [137 L.Ed.2d 1, 117 S.Ct. 855].) Animal testing is an area of widespread public concern and controversy, and the viewpoint of animal rights activists contributes to the public debate. (See *McGill v. Parker* (1992) 582 N.Y.S.2d 91, 96 [179 A.D.2d 98, 106].)

---

[5] As discussed below, the evidence shows Agranoff violated San Diego Municipal Code section 52.2003, which precludes picketing targeted at a specific residence. Because Macdonald met her burden of showing a probability of succeeding on that cause of action, we need not address her contention the evidence showed Agranoff's violation of that ordinance as a matter of law.

■ Moreover, defendants' speech took place in a public forum. "Cases construing the term 'public forum' as used in section 425.16 have noted that the term 'is traditionally defined as a place that is open to the public where information is freely exchanged.' [Citation.] 'Under its plain meaning, a public forum is not limited to a physical setting, but also includes other forms of public communication.' " (*ComputerXpress, supra,* 93 Cal.App.4th 993, 1006.) Statements on SHAC USA's Web site are accessible to anyone who chooses to visit the site, and thus they "hardly could be more public." (*Wilbanks v. Wolk, supra,* 121 Cal.App.4th at p. 895; see *ComputerXpress,* at p. 1007.) As to Agranoff, a public street is a "traditional public forum" even when it runs through a residential neighborhood. (*Frisby v. Schultz* (1988) 487 U.S. 474, 480–481 [101 L.Ed.2d 420, 108 S.Ct. 2495].) Plaintiffs do not assert that either the public interest or public forum criterion is unsatisfied.

## III

### *Collateral Estoppel Is Inapplicable*

Because defendants met their threshold burden under section 425.16, the burden shifted to plaintiffs to demonstrate a probability of success on the merits of each of their causes of action. Plaintiffs contend that under the collateral estoppel aspect of the res judicata doctrine, the trial court's granting of a preliminary injunction conclusively establishes their probability of succeeding on the merits of each of their claims for purposes of the section 425.16 analysis. Plaintiffs suggest that because defendants do not challenge the court's findings on the preliminary injunction, the second prong of the section 425.16 analysis is not subject to review on appeal. We conclude collateral estoppel is inapplicable.

■ "The doctrine of *res judicata* gives certain *conclusive effect* to a *former judgment* in subsequent litigation involving the same controversy. It seeks to curtail multiple litigation causing vexation and expense to the *parties* and wasted effort and expense in *judicial administration*." (7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 290, p. 820.) Under the collateral estoppel aspect of res judicata, relitigation of an issue previously adjudicated is generally precluded if certain criteria are met. "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].) The party asserting collateral estoppel has the burden of establishing

these threshold requirements. (*Bame v. City of Del Mar* (2001) 86 Cal.App.4th 1346, 1364 [104 Cal.Rptr.2d 183].)

In *Lam v. Ngo* (2001) 91 Cal.App.4th 832 [111 Cal.Rptr.2d 582], the court rejected the notion that a preliminary injunction had an issue preclusive effect on an anti-SLAPP motion. There, the "trial court did not consider the merits of [the defendant's] motion because it viewed the motion as nothing more than a rerun of the preliminary injunction question." (*Id.* at p. 843.) The appellate court concluded collateral estoppel was inapplicable because the *issues* on preliminary injunction and an anti-SLAPP suit are not identical. (*Ibid.*)

The court explained: "In deciding whether to grant a preliminary injunction, the trial court not only assesses 'the likelihood that the plaintiff will prevail at trial,' but 'the interim harm that the plaintiff will likely sustain if the injunction were denied.' [Citation.] Trial courts must balance the respective equities, and in any event the decision is tested under an abuse of discretion standard. [Citation.] [¶] By contrast, in passing on anti-SLAPP suit motions, the trial court faces a much more binary task, more akin to a summary judgment motion: Has the plaintiff made a prima facie showing of facts which, if proved at trial, support a favorable judgment?" (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 843.) "Additionally, a key difference between preliminary injunctions and special motions to strike is the role of the individual cause of action. A single cause of action can sustain a preliminary injunction. [Citation.] By contrast, an anti-SLAPP suit motion involves examination of each of the causes of action attacked, because the purpose is to weed out meritless 'claims' at any early stage." (*Id.* at p. 844.)

We agree with the *Lam v. Ngo* court's analysis. This case also "illustrates how the plaintiff's ability to obtain a preliminary injunction cannot be equated with a 'probability' the plaintiff will prevail on the claim." (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 843.) The preliminary injunction here does not even affect Agranoff, the only defendant who was actually involved in one of the protests at Macdonald's home, and in issuing the injunction the court did not address many of the complaint's causes of action.

Further, the finality requirement of collateral estoppel is unmet. A preliminary injunction is a *provisional* remedy, and the trial court "possesses the inherent power to modify its preliminary injunction which is of a continuing or executory nature." (*City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 328 [54 Cal.Rptr.2d 588]; Code Civ. Proc., § 532; 6 Witkin, Cal. Procedure (4th ed. 1997) Provisional Remedies, § 396, pp. 322–323.) "There is no inflexible rule as to the effect of the granting or denial of a preliminary injunction on subsequent litigation, but

unless it appears that the court intended a final adjudication of the issue involved, a decision on an application for a preliminary injunction does not amount to a decision on the ultimate rights in controversy." (*Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 612 [220 P.2d 729].) The record reveals no such intention as to SHAC USA and Kjonaas, and Agranoff is not subject to the preliminary injunction.

IV

*Plaintiffs Showed a Probability of Prevailing on Their Harassment Cause of Action Against SHAC USA and Kjonaas*

A

The First Amendment to the United States Constitution and the California Constitution (art. I, § 2, subd. (a)) prohibit the enactment of laws abridging the freedom of speech. The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people" (*Roth v. United States* (1957) 354 U.S. 476, 484 [1 L.Ed.2d 1498, 77 S.Ct. 1304]), and it "attempt[s] to secure the 'widest possible dissemination of information from diverse and antagonistic sources.' " (*New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 266 [11 L.Ed.2d 686, 84 S.Ct. 710].) Speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea." (*Terminiello v. City of Chicago* (1949) 337 U.S. 1, 4 [93 L.Ed. 1131, 69 S.Ct. 894].)

The right of free speech, however, is not unlimited. (*Near v. Minnesota* (1931) 283 U.S. 697, 708 [75 L.Ed. 1357, 51 S.Ct. 625]; *Aguilar v. Avis Rent-A-Car System, Inc.* (1999) 21 Cal.4th 121, 142–145 [87 Cal.Rptr.2d 132, 980 P.2d 846].) "The First Amendment permits 'restrictions upon the content of speech in a few limited areas, which are "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." ' " (*Virginia v. Black* (2003) 538 U.S. 343, 358–359 [155 L.Ed.2d 535, 123 S.Ct. 1536].) These categories include defamatory speech, fighting words, incitement to riot or imminent lawless action, obscenity and child pornography. (*Bose Corporation v. Consumers Union of United States, Inc.* (1984) 466 U.S. 485, 504 [80 L.Ed.2d 502, 104 S.Ct. 1949].)

 "[T]he First Amendment also permits a State to ban a 'true threat.' [Citations.] [¶] 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.]" (*Virginia v. Black, supra,* 538 U.S. at p. 359.) "Violence and threats of violence . . . fall outside the protection of the First Amendment because they coerce by unlawful *conduct,* rather than persuade by expression, and thus play no part in the 'marketplace of ideas.' As such, they are punishable because of the state's interest in *protecting individuals from the fear of violence,* the disruption fear engenders and the possibility the threatened violence will occur." (*In re M.S.* (1995) 10 Cal.4th 698, 714 [42 Cal.Rptr.2d 355, 896 P.2d 1365], second italics added.)

 In California, speech that constitutes "harassment" within the meaning of section 527.6 is not constitutionally protected, and the victim of the harassment may obtain injunctive relief. "Harassment" is defined as "unlawful violence, *a credible threat of violence,* or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff." (§ 527.6, subd. (b), italics added.) " 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

 "Section 527.6 is intended 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' " (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 403 [5 Cal.Rptr.3d 137]; Cal. Const., art. I, § 1.) The statute " ' "establish[es] an expedited procedure for enjoining acts of 'harassment' as defined." ' " (*Russell v. Douvan,* at p. 403.)

 "Context is everything in threat jurisprudence." (*United States v. Bell* (9th Cir. 2002) 303 F.3d 1187, 1192, citing *Planned Parenthood of Colombia/Willamette, Inc. v. American Coalition of Activists* (9th Cir. 2002) 290 F.3d 1058, 1071 (*Planned Parenthood*). "Indeed, context is critical in a true threats case and history can give meaning to the medium." (*Planned Parenthood,* at p. 1078; see also *In re George T.* (2004) 33 Cal.4th 620, 635 [16 Cal.Rptr.3d 61, 93 P.3d 1007] [under Penal Code section 422 a "communication that is ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify the communication's meaning"].)

In *Planned Parenthood,* the court held that in analyzing whether a "threat of force" was made within the meaning of the Freedom of Access to Clinic Entrances Act (FACE), title 18 of United States Code section 248,[6] the alleged threat must be analyzed in light of "the entire context and under all the circumstances," including prior violence by third parties. (*Planned Parenthood, supra,* 290 F.3d at p. 1077.) There, physicians and health care clinics that provided women's health care services, including abortions, brought suit under FACE, claiming the American Coalition of Life Activists (ACLA) targeted them with threats. A "Deadly Dozen 'GUILTY' " poster identified three plaintiff physicians among 10 others; a " 'GUILTY' " poster contained a plaintiff physician's name, address and photograph; and the " 'Nuremburg Files' " was "a compilation about those whom the ACLA anticipated one day might be put on trial for crimes against humanity. The 'GUILTY' posters identifying specific physicians were circulated in the wake of a series of 'WANTED' and 'unWANTED' posters that had identified other doctors who performed abortions before they were murdered." (*Id.* at p. 1062.)

Under FACE, whether ACLA made threats of force was a jury question. (*Planned Parenthood, supra,* 290 F.3d at pp. 1063, 1070.) The court held that although the posters contained no express threats themselves, the jury's finding in favor of the plaintiffs was supported by substantial evidence, explaining: "ACLA was aware that a 'wanted'-type poster would likely be interpreted as a serious threat of death or bodily harm by a doctor in the reproductive health services community who was identified on one, given the previous pattern of 'WANTED' posters identifying a specific physician followed by that physician's murder. The same is true of the posting about these physicians on that part of the 'Nuremberg Files' where lines were drawn through the names of doctors who provided abortion services and who had been killed or wounded." (*Id.* at p. 1063.) The court rejected the notion the surrounding evidence may not include "a context of violence that includes the independent action of others." (*Id.* at p. 1071.)

ACLA also argued the First Amendment required reversal because liability was premised on political speech that constituted neither an incitement to imminent lawless action or a true threat, and since the posters contained no express threat the case was "really an incitement case in disguise." (*Planned Parenthood, supra,* 290 F.3d at p. 1072.) The court noted that under the United States Supreme Court's opinion in *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 89 S.Ct. 1827] (*Brandenburg*), "the First

---

[6] "FACE gives aggrieved persons a right of action against whoever by 'threat of force . . . intentionally . . . intimidates . . . any person because that person is or has been . . . providing reproductive health services.' " (*Planned Parenthood, supra,* 290 F.3d at p. 1062, citing 18 U.S.C. § 248(a)(1) and (c)(1)(A).)

Amendment protects speech that advocates violence, so long as the speech is not directed to inciting or producing imminent lawless action and is not likely to incite or produce such action." (*Planned Parenthood, supra,* at p. 1071.) The *Planned Parenthood* court, however, essentially concluded imminent lawless action is not an element of a true threat. It explained that "[i]f ACLA had merely endorsed or encouraged the violent actions of others, its speech would be protected. [¶] However, while advocating violence is protected, threatening a person with violence is not. In *Watts v. United States* [(1969)] 394 U.S. 705, [707] [22 L.Ed.2d 664, 89 S.Ct. 1399], the Court explicitly distinguished between political hyperbole, which is protected, and true threats, which are not." (*Planned Parenthood, supra,* 290 F.3d at p. 1072.)

B

This case is analogous to *Planned Parenthood,* and considering the entire factual context, the trial court could reasonably conclude SHAC USA's Web site contained credible threats of violence toward Macdonald by SHAC USA and Kjonaas within the meaning of section 527.6.

In October 2002 Kjonaas was deposed in another case against SHAC USA. He conceded that SHAC USA "targets" specific HLS employees in its campaign against HLS. Further, SHAC USA wrote in a Web site entry that it "has identified, and is targeting, any and every pillar of support that HLS has. This includes . . . individual employees." The entry contained a "Click <u>here</u>" prompt to learn the identities, and presumably home addresses and other identifying information, of the "current targets" of the campaign. Additionally, a SHAC USA newsletter stated: "The SHAC campaign employs a variety of tactics, aimed at hitting HLS'[s] every vulnerability. *Campaign targets can expect* regular phone and email *blockades*, black faxes, demonstrations and *disruptions inside and outside their offices, civil disobedience, home demonstrations of executives*, and publicity stunts . . . . Quarterly newsletters keep our supporters informed of latest victories, *new targets*, inspirational stories and general activist info." (Italics added.) SHAC USA and Kjonaas do not deny they specifically targeted Macdonald for this type of treatment.

Further, Kjonaas knew that in England animal rights activists had physically attacked HLS employees. He testified in the 2002 deposition that he was familiar with the SHAC organization in England and had worked for it as a volunteer. SHAC USA published on its Web site an article it attributed to the Associated Press, titled "U.S. activists using British ecoterror tactics." SHAC USA quoted the article as stating, " 'In England last summer, activists beat a Huntingdon managing director and sprayed a caustic liquid in the face of

another Huntingdon employee.' " The Web site article quoted Kjonaas as saying, " 'inducing human terror "pales by comparison to what . . . animals feel" during research.' "

Also, SHAC USA's Web site published "tactics" animal rights activists have used against HLS employees, including physical violence and threats of violence. In March 2001 the Web site contained an entry titled "From the Research Defense Society of the UK." The entry listed "tactics [that] have been used by animal rights extremists campaigning against HLS and similar companies in the last three years." The entry noted that "[r]epeated use of several tactics against one individual is not unusual." The list contained such tactics as "[d]emonstrations at your home or place of work, including verbal abuse using a loudhailer," "[c]haining gates shut or blocking gates with old cars to trap staff on site," "[p]hysical assaults on yourself and your partner, including spraying cleaning fluid into your eyes," "[s]mashing all the windows in your home when your family is home," "[s]ledghammer attack on your car—while you are still inside it," "[f]irebombing your car in your drive, firebombing sheds and garages," "[b]omb hoaxes requiring evacuation of premises," "[t]hreatening telephone calls and letters (threats to kill or injure you, your partner and children)," and "[a]rranging for the undertaker to call to collect your body." At the bottom of this entry, SHAC USA wrote: *"Editors' Note: Now don't get any funny ideas, folks."* SHAC USA's Web site contained essentially the same entry in 2002.[7]

Additionally, the evidence shows that after SHAC USA previously targeted another HLS employee, animal rights activists trespassed on and vandalized his residential property in New York. In a declaration, Mark Bibi, legal counsel for HLS, stated SHAC USA and Kjonaas "started to target me in July 2002, when SHAC [USA] announced in its summer 2002 newsletter a new focus of its campaign, and new targets, including me." In August 2002 Bibi began getting harassing telephone calls at home. "[O]n one occasion the caller exclaimed 'murderer, how can you live with yourself?' " In October 2002 activists protested at Bibi's home in New York. SHAC USA's Web site published a report of the protest, attributed to "the ADL—Long Island." The report contained Bibi's home address and concluded with, " 'That's right Mark, we will be back, and with more people.' "

Bibi's declaration also stated: "Sometime during the night of November 6, 2002, . . . [persons] unlawfully entered upon my property, and severely vandalized my home and my automobile which was parked in my driveway.

---

[7] SHAC USA and Kjonaas contend this was merely a republication of an article by a proanimal testing entity regarding activities of animal rights activists, and as such it is constitutionally protected speech. Even if the article itself is protected, however, the court may consider it as part of the context in which other Web site postings were made.

These vandals smashed the windshield of my car with a large rock and, with red paint, painted the term [']ALF,' . . . and other graffiti, all over my car. My house was also severely vandalized and damaged; using the same red paint, the vandals prominently painted upon all four . . . sides of my house numerous slogans, such as 'PUP KILLER,' '9,000,000 DEAD CUS [sic] OF YOU MARK,' [']CLOSE HLS,' 'QUIT NOW,' and 'STOP HELPIN [sic] BAKER [Chief Executive Officer of HLS].' "

SHAC USA's Web site published a report of the vandalism, which was "[f]orwarded by NY activists" and attributed to ALF. It stated: " 'Tonight 11/6/02 we stopped by the home of Mark Bibi, [street address] and made a bloody mess of the place. The house was covered with red paint and sprayed slogans denouncing his work for HLS, leaving the home almost as bloody as his palms! We tinkered with his daughter's car, painted that up too, and finished the masterpiece with a boulder through the windshield! [¶] Welcome to the post-electoral democracy Mark! We are damn tired of pulling the pant legs of politicians begging for adjustments in the way animals and the earth are treated[.] [W]e are taking the future into our own hands and you and your dying business are not part of it!' " The claimed tinkering with the car caused Bibi to have it towed to a service station for evaluation.

After a December 2002 protest at Bibi's home, SHAC USA's Web site contained a report of it, again attributed to "NY activists." The report concluded with, " 'Until all life is freed from the confines of HLS, every cage is smashed, and the building leveled—Mark Bibi, . . . and HLS can expect [an] escalating campaigning against them. [¶] Make No Mistake, We Will Win!' "[8]

In May 2003, the same month as the incidents at Macdonald's home, SHAC USA wrote on its Web site: "The SHAC campaign has over the last year hit HLS in a multi[-]pronged attack on the workers, shareholders, and clients resulting in all-time low worker morale, a rock bottom share price, and a loss of customer confidence. [¶] Workers: Everyday [sic] of the week a crowd of protesters assemble [sic] outside the gates of HLS'[s] main lab site in Huntingdon. All day long as workers of HLS come go [sic] they are greeted with screaming protesters who let them know just how much their [sic] worth. Every eight weeks SHAC holds national demonstrations wherein over a thousand protestors show up to the lab, the town center, or a company affiliated with HLS in the area and lay siege to 'em. [L]arge demonstrations are always followed up with several *home demonstrations of the employees. These tactics combined with the ALF's series of car bombings of workers (at*

---

[8] According to the complaint here, "HLS and . . . Bibi were successful in obtaining a temporary restraining order and preliminary injunction against SHAC, SHAC USA, and several other affiliated animal rights organizations in New York."

*11 now) and numerous attacks on their homes has . . . a tremendous effect.* There is a high turnover rate, and according to court documents *several workers are having a hard time even finishing a days [sic] work, or sleeping at night.*" (Italics added.)

In her declaration, Macdonald stated she was "aware of numerous acts of violence . . . against HLS employees including car bombings and beatings in England." Macdonald did not state when she learned the information, but presumably as an HLS executive she was aware of those incidents and the incidents at Bibi's home before SHAC USA targeted her. Macdonald wrote that as a result of the Web site entries and incidents at her home, "I am now constantly looking over my shoulder to see if I am being followed or observed by anyone. I do not enter my property without making sure my car doors are locked and when I return home I do not exit my car until I enter the garage and the garage door is closed completely." She also explained, "I am extremely concerned about injury to myself, my husband and my property."

Given the background of violent attacks on HLS employees in England, and the trespass and vandalism at Bibi's home in New York *after being specifically targeted in SHAC USA's campaign,* the court could reasonably determine SHAC USA's Web site entries specifically targeting Macdonald and reporting the May 3 and 25, 2003 incidents at her home and giving her home address would put a reasonable person in fear for her safety, or the safety of her family (§ 527.6, subd. (b)(2)). The entry regarding the May 3 incident called on her neighbors to pressure her to move out of the neighborhood, and the entry regarding the May 25 incident warned Macdonald, "your censor [sic] lights are a joke, the cops are too slow to get there within a reasonable time, and thousands of activists know where you live."

Further, the evidence supports a finding that although the postings regarding the May 3 and 25 incidents were attributed to anonymous third parties, those postings, in conjunction with being targeted by SHAC USA, would intimidate Macdonald and cause her to fear Kjonaas and other persons affiliated with SHAC USA, as well as other animal rights activists, and indeed Kjonaas knew as much and that was the desired result. SHAC USA's Web site acknowledged that HLS employees targeted in its campaign against HLS could expect home visits and civil disobedience, just as Bibi experienced. To qualify as a true threat, a communication need not specify who would carry out the threat. (*Planned Parenthood, supra,* 290 F.3d at pp. 1077, 1078.) " ' "The fact that a threat is subtle does not make it less of a threat." ' " (*Id.* at p. 1075.) Surely, the postings singling out and threatening Macdonald are the type of harassment the Legislature intended to proscribe in section 527.6.

 The disclaimer SHAC USA posts on its Web site is relevant context evidence, but it is not dispositive. "It is not necessary that the defendant intend to, or be able to carry out his threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat." (*Planned Parenthood, supra,* 290 F.3d at p. 1075; see *United States v. Orozco-Santillan* (9th Cir. 1990) 903 F.2d 1262, 1265, fn. 3.) "[W]hether or not the maker of the threat has an actual intention to carry it out, 'an apparently serious threat may cause the mischief or evil toward which the statute was in part directed.' " (*Planned Parenthood, supra,* at p. 1076.) Even if Macdonald knew of the disclaimer, the court could reasonably find she perceived entries on SHAC USA's Web site as threats.

C

SHAC USA and Kjonaas rely on *Brandenburg, supra,* 395 U.S. 444, in which the Supreme Court reversed the conviction of a Ku Klux Klan leader under a "Criminal Syndicalism Act" that punished persons who " 'advocate or teach the duty, necessity, or propriety' of violence 'as a means of accomplishing industrial or political reform'; or who publish or circulate or display any book or paper containing such advocacy." (*Id.* at p. 448.) The Klansman threatened "revengeance" if "our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race." (*Id.* at p. 446.) The court relied on "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is *directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . .* '[T]he mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.' " (*Id.* at pp. 447–448, italics added.)

Additionally, SHAC USA and Kjonaas rely on *NAACP v. Claiborne Hardware Company* (1982) 458 U.S. 886 [73 L.Ed.2d 1215, 102 S.Ct. 3409] (*Claiborne Hardware*). *Claiborne Hardware* arose from the boycott by Black persons of White merchants in Claiborne County, Mississippi, "to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice." (*Id.* at p. 907.) The merchants sued the NAACP and its field secretary, Charles Evers, among others, seeking injunctive relief and damages.

The court rejected the plaintiffs' contention Evers could be held liable because he " 'threatened violence on a number of occasions against boycott breakers.' " (*Claiborne Hardware, supra,* 458 U.S. at p. 898.) During a speech at an NAACP meeting, " 'Evers told his audience that they would be

watched and that blacks who traded with white merchants would be *answerable to him.* . . . [Further], Evers told the assembled black people that any "uncle toms" who broke the boycott would "have their necks broken" by their own people.' " (*Id.* at p. 900, fn. 28.) In another speech at a church, Evers told the group "that boycott violators would be 'disciplined' by their own people and warned that the Sheriff could not sleep with boycott violators at night." (*Id.* at p. 902.) On another occasion, Evers told a crowd of several hundred people, " 'If we catch any of you going in any of them racist stores, we're gonna break your damn neck.' " (*Ibid.*)

The court concluded Evers's speeches "predominantly contained highly charged political rhetoric lying at the core of the First Amendment," and the speeches "did not transcend the bounds of protected speech set forth in *Brandenburg.*" (*Claiborne Hardware, supra,* 458 U.S. at pp. 926–927, 928.) The court explained that when "spontaneous and emotional appeals for unity and action in a common cause . . . do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the 'profound national commitment' that 'debate on public issues should be uninhibited, robust and wide-open.' " (*Id.* at p. 928.) The court noted that Evers's speeches were not closely followed by violence, and rather acts of violence by third parties occurred weeks or months later. (*Ibid.*)

In *Claiborne Hardware,* the court also held that "[c]ivil liability may not be imposed merely because an individual belonged to a group [there the NAACP], some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." (*Claiborne Hardware, supra,* 458 U.S. at p. 920.) "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." (*Id.* at p. 908.) "To impose liability without a finding that the NAACP authorized . . . or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment." (*Id.* at p. 931.)

Neither *Brandenburg* nor *Claiborne Hardware,* however, arose under a statute proscribing threats of violence or in the context of a threat against a *specific* named individual. Moreover, immediacy or the prospect of imminent lawless action is not an element of a claim for violation of a threats statute. (*State v. E.J.Y.* (2002) 113 Wn.App. 940, 950 [55 P.3d 673, 678]; see also *Planned Parenthood, supra,* 290 F.3d at p. 1071 (maj. opn. of Rymer, J.); *id.* at pp. 1106–1107 (dis. opn. of Berzon, J.).) Further, we are not concerned here with defendants' association with ALF or other animal rights activists.

We base their potential liability on their own credible threats of violence, and their lack of intent to actually carry out the threats is immaterial.[9]

D

HLS does not have a cause of action under section 527.6, because the statute applies only to natural persons. (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333 [85 Cal.Rptr.2d 86]; *Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612, 618–619 [225 Cal.Rptr. 651].) Section 527.8, however, allows an employer to seek injunctive relief on behalf of its employees under the same criteria set forth in section 527.6. "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee prohibiting further unlawful violence or threats of violence by that individual." (§ 527.8, subd. (a).) "[T]he Legislature intended to provide employers with the remedy of injunctive relief to protect their employees by preventing unlawful violence where it is reasonably likely such unlawful violence may occur in the future." (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 335.)

Although the complaint does not specifically cite section 527.8, it does allege facts giving rise to a cause of action by HLS under that statute, and

---

[9] In supplemental briefing Kjonaas and SHAC USA assert the publications on SHAC USA's Web site are privileged under title 47 of United States Code section 230(c)(1), a provision of the Communications Decency Act, which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The statute "created a federal immunity to any cause of action that would make interactive service providers liable for information originating with a third party user of the service." (*Gentry v. eBay, Inc.* (2002) 99 Cal.App.4th 816, 828 [121 Cal.Rptr.2d 703], citing *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, 330.) " 'Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.' " (*Gentry v. eBay, Inc., supra,* at pp. 828–829.)

To any extent title 47 of United States Code section 230(c)(1) arguably applies in the context of a threats statute, defendants have abandoned the issue by not raising it in their opening brief. (*California Recreation Industries v. Kierstead* (1988) 199 Cal.App.3d 203, 205, fn. 1 [244 Cal.Rptr. 632].) Moreover, there is no evidence that SHAC USA's Web site is an "interactive computer service," which the statute defines as "any information service, system, or access software provider *that provides or enables computer access by multiple users to a computer server.*" (47 U.S.C., § 230(f)(2), italics added.) Further, as discussed, given the entire context, including targeting Macdonald for harassment, the court could reasonably find that SHAC USA and Kjonaas made credible threats of violence toward her on SHAC USA's Web site.

defendants do not contend otherwise. For reasons discussed above, we conclude HLS also showed a probability of prevailing on the merits of its harassment claim.

Plaintiffs' evidence against Agranoff merely shows he demonstrated in front of Macdonald's home by holding a candle in silence. Thus, his conduct is not proscribed by section 527.6.

## V

### *Macdonald Showed a Probability of Prevailing on Her Causes of Action Against SHAC USA and Kjonaas for Intentional Infliction of Emotional Distress, Invasion of Privacy and Unfair Competition*

### A

"Peace of mind is now recognized as a legally protected interest, the intentional invasion of which is an independent wrong, giving rise to liability without the necessity of showing the elements of any of the traditional torts." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 403, p. 483.) "[T]o state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." (*Trerice v. Blue Cross of America* (1989) 209 Cal.App.3d 878, 883 [257 Cal.Rptr. 338].) "Conduct, to be ' "outrageous" ' must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." (*Ibid.*)

"[A]rticle I, section 1 of the California Constitution protects Californians against invasions of privacy by nongovernmental as well as governmental parties." (*Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 227 [74 Cal.Rptr.2d 843, 955 P.2d 469].) "[T]he action for intrusion has two elements: (1) intrusion into a private place, conversation or matter, (2) in a manner highly offensive to a reasonable person." (*Id.* at p. 231.) To satisfy the first element, "the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff. The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or solitude in the place, conversation or data source." (*Id.* at p. 232.) The expectation of privacy need not be complete or absolute privacy. Rather, "[p]rivacy for purposes of the intrusion tort must be evaluated with respect to the identity of the alleged intruder and the nature

of the intrusion." (*Sanders v. American Broadcasting Companies* (1999) 20 Cal.4th 907, 915, 918 [85 Cal.Rptr.2d 909, 978 P.2d 67].) "[D]etermining offensiveness requires consideration of all the circumstances of the intrusion, including its degree and setting and the intruder's 'motives and objectives.' " (*Shulman v. Group W Productions, Inc.*, at p. 236.)

SHAC USA and Kjonaas contend Macdonald cannot recover for these torts because their speech is constitutionally protected. We have held to the contrary, however, and we conclude the trial court could reasonably find in favor of Macdonald on these causes of action based on SHAC USA's Web site entries targeting her for illegal activity such as "civil disobedience" and threatening her safety.[10] Indeed, in enacting section 527.6 the Legislature intended to supplement existing causes of action for emotional distress and invasion of privacy available to a victim of harassment. (*Diamond View Limited v. Herz, supra,* 180 Cal.App.3d at p. 619.)

As a business entity, however, HLS lacks standing to pursue these torts. (*Tenants Assn. of Park Santa Anita v. Southers* (1990) 222 Cal.App.3d 1293, 1304 [272 Cal.Rptr. 361] [emotional distress]; *Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 930 [33 Cal.Rptr.2d 766] [invasion of privacy].) Further, Agranoff's conduct did not cause Macdonald actionable emotional distress, and he did not invade her privacy by picketing peacefully in front of her home. Agranoff was on a public sidewalk and a trier of fact could not reasonably find his conduct was highly offensive.

**B**

**1**

As to the unfair competition cause of action, Business and Professions Code section 17200 prohibits "any unlawful, unfair or fraudulent business act or practice." "The Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545], quoting *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111, 113 [101 Cal.Rptr. 745, 496 P.2d 817].) "The unfair competition law thus creates an independent action when a business practice violates some other law." (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1170 [121 Cal.Rptr.2d 79].)

When this lawsuit commenced, section 17204 provided that "any person acting for the interests of itself, its members or the general public"

---

[10] These causes of action are not subject to a jury trial because plaintiffs seek only injunctive relief, attorney fees and costs.

could bring an unfair competition cause of action. (Former § 17204.) On November 2, 2004, the voters approved Proposition 64; it became effective the following day. (Cal. Const., art. II, § 10, subd. (a).) Proposition 64 amended Business and Professions Code section 17204 to state an unfair competition cause of action may be prosecuted "by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Further, Proposition 64 amended Business and Professions Code section 17203 to require that a private party may bring a representative action only if he or she meets the standing requirement of section 17204 and complies with class certification requirements set forth in Code of Civil Procedure section 382.

■ The question is whether Proposition 64 applies to cases pending on appeal.[11] " 'A retrospective law is one which affects rights, obligations, acts, transactions and conditions which are performed or exist prior to the adoption of the statute.' " (*Aetna Cas. & Surety Co. v. Ind. Acc. Com.* (1947) 30 Cal.2d 388, 391 [182 P.2d 159].) A statute has retrospective effect when it substantially changes the legal consequences of past events. (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7 [255 Cal.Rptr. 412, 767 P.2d 679].) "It is well settled that a new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [279 Cal.Rptr. 592, 807 P.2d 434].)

■ "The repeal of a statutory right or remedy, however, presents entirely distinct issues from that of the prospective or retroactive application of a statute. A well-established line of authority holds: ' " 'The unconditional repeal of a special remedial statute without a saving clause stops all pending actions where the repeal finds them. If final relief has not been granted before the repeal goes into effect it cannot be granted afterwards, even if a judgment has been entered and the cause is pending on appeal. The reviewing court must dispose of the case under the law in force when its decision is rendered.' " [Citations.]' [Citations.]" (*Physicians Com. for Responsible Medicine v. Tyson Foods* (2004) 119 Cal.App.4th 120, 125–126 [13 Cal.Rptr.3d 926] (italics omitted).)

■ "The justification for this rule is that all statutory remedies are pursued with full realization that the legislature may abolish the right to recover at any time." (*Callet v. Alioto* (1930) 210 Cal. 65, 67–68 [290 P. 438]; see Gov. Code, § 9606 ["Any statute may be repealed at any time, except when vested rights would be impaired. Persons acting under any statute act in contemplation of this power of repeal."].) "Because it is a

---

[11] We asked the parties to submit supplemental briefing on Proposition 64, and we have taken their responses into consideration.

creature of statute, the right of action exists only so far and in favor of such person as the legislative [or initiative] power may declare." (*Graczyk v. Workers' Comp. Appeals Bd.* (1986) 184 Cal.App.3d 997, 1007 [229 Cal.Rptr. 494].) Unlike a common law right, a " 'statutory remedy does not vest *until final judgment.*' " (*County of San Bernardino v. Ranger Ins. Co.* (1995) 34 Cal.App.4th 1140, 1149 [41 Cal.Rptr.2d 57].)

Based on these principles, we conclude Proposition 64 applies to this case and others filed before its effective date of November 3, 2004. The unfair competition law (Bus. & Prof. Code, § 17200 et seq.) is a statutory remedy, not a common law remedy. In *Bank of the West v. Superior Court, supra,* 2 Cal.4th at page 1264, the court explained the common law of unfair competition required a showing of competitive injury to one's business. The court noted such a showing is not required by statutes prohibiting unfair competition: "[S]tatutory 'unfair competition' extends to all unfair and deceptive business practices. For this reason, the statutory definition of 'unfair competition' 'cannot be equated with the common law definition . . . .' " (*Ibid.*) Moreover, Proposition 64 contained no saving clause.

2

The complaint alleges Macdonald sustained damage to real property and personal property, and thus she has standing to proceed individually on the unfair competition cause of action. Because Macdonald showed a probability of prevailing on her causes of action for harassment, invasion of privacy and intentional infliction of emotional distress, it is also probable she will prevail on her unfair competition cause of action.

The complaint also alleges Macdonald purports to represent the general public, and under amended Business and Professions Code sections 17203 and 17204 she may not do so without complying with the class action certification procedures of Code of Civil Procedure section 382. We direct the trial court to grant defendants judgment on the pleadings on the unfair competition cause of action insofar as the representative portion is concerned. (See Code of Civ. Proc. § 438, subd. (c)(3)(B)(ii) [providing the trial court may grant a motion for judgment on the pleadings when the complaint does not state facts sufficient to constitute a cause of action against that defendant].) Although leave to amend should be granted if it appears the plaintiff may attempt to seek class certification (see *Virginia G. v. ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1852 [19 Cal.Rptr.2d 671]), Macdonald asserts no desire to do so.

HLS submits Proposition 64 does not preclude its unfair competition cause of action because defendants' "actions have caused employees to quit and

companies to cease doing business with HLS, all intentional acts to interfere with HLS'[s] economic advantage." HLS cites the declarations of Michael Caulfield, HLS's general manager in the United States, and Bibi, whose home was vandalized after SHAC USA's Web site targeted him. Neither declaration, however, states that any HLS employee or company doing business with it severed ties with HLS. Accordingly, HLS may not maintain an unfair competition claim.[12]

## VI

### *Macdonald Showed a Probability of Prevailing on Her Cause of Action Against Agranoff for Municipal Code Violation*

Section 52.2003 of the San Diego Municipal Code provides: "It is unlawful for any person to engage in picketing before or about the residence or dwelling of any individual in The City of San Diego." In enacting the ordinance, the city council relied on *Frisby v. Schultz, supra,* 487 U.S. 474, in which the court held the government may ban "focused picketing taking place solely in front of a particular residence." (*Id.* at p. 483.) The court explained the "First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech," and a resident whose home is picketed "is figuratively, and perhaps literally, trapped within the home . . . [and] is left with no ready means of avoiding the unwanted speech." (*Id.* at p. 487.) The court noted the ordinance at issue there was constitutional because it did not prohibit "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses." (*Id.* at p. 483.)

▋ Agranoff's declaration states that on "May 25, 2003, I was present at a peaceful protest near the home of HLS employee, Claire Mac[d]onald," and "[t]his was the first and only time I have ever been to . . . Mac[d]onald's home." On appeal he admits "that on one occasion [he] participated along with fifteen to twenty other people in a peaceful protest *in front of Mac[d]onald's home.*" (Italics added.) Agranoff does not contend his conduct did not violate San Diego Municipal Code section 52.2003. Rather, he asserts that since the provision appears in an article of the Municipal Code titled "Police Police Regulations Offenses Against Government," there is no private right of action. Government Code section 36900, subdivision (a), however,

---

[12] HLS does not assert Code of Civil Procedure section 527.8 gives rise to an employer's unfair competition claim under Business and Professions Code sections 17203 and 17204, as amended by Proposition 64, based on its employee's actual injury, and thus we do not reach that issue.

expressly provides that a violation of a city ordinance may be redressed by civil action. (See also *Riley v. Hilton Hotels Corp.* (2002) 100 Cal.App.4th 599, 607 [123 Cal.Rptr.2d 157].) We conclude Macdonald showed a probability of prevailing against Agranoff on this cause of action.

There is no evidence Kjonaas or anyone affiliated with SHAC USA picketed at Macdonald's home, and thus this cause of action cannot proceed against them. Further, this is not a viable cause of action for HLS.

## VII

### *Plaintiffs Did Not Establish a Probability of Prevailing on the Remaining Causes of Action*

 " 'The essence of the cause of action for trespass is an "unauthorized entry" onto the land of another.' " (*Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1480 [232 Cal.Rptr. 668].) Plaintiffs produced no evidence Kjonaas, any SHAC activist or Agranoff trespassed on Macdonald's property. Defendants assert Agranoff is liable for trespass because "he provided transportation to the apparent trespassers." Even assuming the persons Agranoff transported after the incident had trespassed on Macdonald's property, his conduct did not direct or authorize their conduct. Further, there is no evidence of a principal and agent relationship to support a ratification theory. (*Claiborne Hardware, supra,* 458 U.S. at p. 927.)

 Further, as to the negligent infliction of emotional distress cause of action, there is no special relationship between Macdonald and SHAC USA, Kjonaas or Agranoff that would impose a duty on them to not cause her emotional distress. The "*negligent* causing of emotional distress is not an independent tort but the tort of *negligence*, involving the usual duty and causation issues." (6 Witkin, Summary of Cal. Law (9th ed. 1988), Torts, § 838, p. 195.) "[T]here is no duty to avoid negligently causing emotional distress to another, and . . . damages for emotional distress are recoverable only if the defendant has breached some other duty to the plaintiff." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 984 [25 Cal.Rptr.2d 550, 863 P.2d 795].) Plaintiffs contend defendants, and SHAC activists, had a duty to not trespass on or vandalize property. Plaintiffs, however, adduced no evidence showing the defendants engaged in such conduct.

 Additionally, plaintiffs' causes of action for intentional and negligent interference with prospective economic advantage lack merit because they point to no evidence SHAC USA, Kjonaas or Agranoff disrupted any relationship between HLS and Macdonald or its other employees or prospective clients. " ' "The tort of intentional . . . interference with prospective

economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another . . . . [Citation.]" [Citation.]' " (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1255–1256 [116 Cal.Rptr.2d 358].) Elements of the tort are actual disruption of the relationship and economic harm to plaintiff proximately caused by the acts of the defendant. (*Id.* at p. 1256.)[13]

## VIII

### *Scope of Injunction*

██ SHAC USA and Kjonaas contend the preliminary injunction is overbroad insofar as it precludes them from coming within 100 feet of any real property known or believed to be lawfully in the possession of any HLS employee; coming within 100 feet of any person known or believed to be an HLS employee or family member, friend or business associate of any HLS employee; and posting or maintaining on any Web site any information regarding any person known or believed to be an HLS employee or family member, friend or business associate of any HLS employee. We apply a substantial evidence test, resolving all factual conflicts and questions of credibility in favor of plaintiffs as the prevailing parties. (*USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444 [4 Cal.Rptr.3d 54].)

██ "An injunction curtailing protected expression will be upheld only if the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Planned Parenthood Assn. v. Operation Rescue* (1996) 50 Cal.App.4th 290, 299 [57 Cal.Rptr.2d 736], citing *Madsen v. Women's Health Care, Inc.* (1994) 512 U.S. 753, 765 [129 L.Ed.2d 593, 114 S.Ct. 2516].) "[I]f a home is involved the state interest in preserving residential privacy is exceptionally potent." (*Planned Parenthood Assn. v. Operation Rescue, supra,* at p. 299.)

██ Plaintiffs sought a preliminary injunction under sections 526 and 527.6. Under section 526, the court may grant an injunction when "it appears by the complaint or affidavits that the commission or continuance of some act during the litigation would produce . . . great or irreparable injury . . . to a party to the action." (§ 526, subd. (a)(2).) Under section 527.6, the court may grant an injunction when there is a threat of harm because of harassment, as defined in the statute. (§ 527.6, subds. (a), (b); see also § 527.8, subds. (a),

---

[13] Plaintiffs assert the evidence establishes "disruption of the relationships," but they cite no supporting evidence. "The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.)

(b).) The "purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act. [Citations.] Consequently, injunctive relief lies only to prevent threatened injury and has no application to wrongs that have been completed. [Citation.] It should neither serve as punishment for past acts, *nor be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future.*" (*Scripps Health v. Marin, supra,* 72 Cal.App.4th at p. 332, italics added.)

Plaintiffs presented no evidence that Kjonaas or anyone else associated with SHAC USA picketed at Macdonald's home or was involved in any trespass or vandalism at her home, or the home of any other HLS employee. Rather, the evidence against SHAC USA and Kjonaas was limited to the postings on SHAC USA's Web site. Accordingly, the court's finding that SHAC USA and Kjonaas trespassed on Macdonald's property and violated San Diego Municipal Code section 52.2003 is without merit. Because the case against SHAC USA and Kjonaas is based on the future risk of continuing threats of violence posted on the Web site, the injunction must be tailored to preclude such threats. (*USS-Posco Industries v. Edwards, supra,* 111 Cal.App.4th at p. 442.) There is no ground to include in the injunction the prohibitions of coming within 100 feet of any real property known or believed to be lawfully in the possession of any HLS employee, or coming within 100 feet of any person known or believed to be an HLS employee, or his or her family member, friend or business associate.

As to SHAC USA's Web site, the injunction may not be broader than necessary to assure SHAC USA and Kjonaas will not again make a credible threat of violence against Macdonald or any other HLS employee, or family members residing with them. (See *Planned Parenthood, supra,* 290 F.3d at p. 1087; §§ 527.6, subd. (c), 527.8, subd. (d).) Thus, SHAC USA and Kjonaas may be enjoined from targeting Macdonald or any other HLS employee, or family members residing with them, and from publishing their names, addresses or other identifying information, as well as reports of trespasses, vandalism or other illegal activity at their homes. (See *Planned Parenthood, supra,* at pp. 1087–1088.) As SHAC USA and Kjonaas point out, they should not be prohibited from publishing an entry "that a particular HLS employee has been convicted of animal cruelty," should that ever be the case, and as the injunction now stands, it improperly "requires removal of all references of any kind [to HLS employees] including purely public references" such as "deleting names from articles published in . . . newspapers . . . which are merely republished" on SHAC USA's Web site. We order the court on remand to delete the references concerning picketing and approaching HLS employees (subcategories "a" and "b"), and more narrowly tailor the injunction insofar as the Web site is concerned (subcategory "c").

## IX

### *Defendants' Request for Attorney Fees*

A "prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (§ 425.16, subd. (c).) "This section authorizes the court to make an award of reasonable attorney fees to a prevailing defendant, which will adequately compensate the defendant for the expense of responding to a baseless lawsuit." (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 785 [54 Cal.Rptr.2d 830].) A "prevailing defendant" within the meaning of section 425.16, subdivision (c), includes a defendant whose anti-SLAPP motion was granted as to some causes of action but not others. (*ComputerXpress, supra,* 93 Cal.App.4th at p. 1020.)

A prevailing defendant is also entitled to attorney fees incurred on appeal. (*ComputerXpress, supra,* 93 Cal.App.4th at p. 1020.) "Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees." (*Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498 [191 Cal.Rptr. 134].) On remand, the trial court is to consider whether under the circumstances of this case the defendants are entitled to fees and, if so, the amount.

### DISPOSITION

We affirm the order on the special motion to strike under section 425.16 as to Macdonald's and HLS's cause of action against SHAC USA and Kjonaas for harassment under sections 527.6 and 527.8, and as to Macdonald's causes of action against them for intentional infliction of emotional distress and invasion of privacy,[14] and as to her individual claim against them under Business and Professions Code section 17200.

We reverse the order as to the following causes of action against SHAC USA and Kjonaas: trespass, negligent infliction of emotional distress, intentional and negligent interference with prospective economic advantage and violation of San Diego Municipal Code section 52.2003. We also reverse the order as to the following causes of action as to HLS only: intentional infliction of emotional distress, invasion of privacy and violation of Business and Professions Code section 17200.

As to Agranoff, we affirm the order as to Macdonald's cause of action against him for violation of San Diego Municipal Code section 52.2003. We reverse the order as to all other causes of action against Agranoff.

---

[14] The sixth cause of action, for "Intrusion into Private Affairs," duplicates the fifth cause of action.

We direct the court on remand to grant SHAC USA and Kjonaas judgment on the pleadings on HLS's unfair competition cause of action, and on Macdonald's unfair competition cause of action insofar as it purports to be a representative action; modify the injunction in accordance with part VIII of this opinion; and consider defendants' request for attorney fees.

The parties are to bear their own costs on appeal.

Benke, J., and McIntyre, J., concurred.