Filed 9/13/23 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NORTH COAST VILLAGE CONDOMINIUM ASSOCIATION,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>NANCY PHILLIPS,<br><br>    Defendant and Appellant. | D079455<br><br><br>(Super. Ct. No. 37-2021-00005317-CU-PT-NC)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on August 23, 2023, be modified as follows:

1.    On page 2, in the last sentence of the last paragraph, the phrase "further proceedings" is deleted and the phrase "a full rehearing on the Association's petition for a workplace violence restraining order" is inserted in its place.

2.     On page 34, in the first sentence of the last paragraph, the phrase "for a full rehearing on the petition" is inserted at the end of the sentence so that the sentence reads:

For the foregoing reasons, we reverse the order denying the Association's workplace violence restraining order petition and remand to the trial court for a full rehearing on the petition.

3. On page 35, in the first sentence of the Disposition, the phrase "to the trial court with directions to conduct a new hearing on the Association's petition for a workplace violence restraining order" is inserted at the end of the sentence so that the full Disposition reads:

> The judgment is reversed and remanded to the trial court with directions to conduct a new hearing on the Association's petition for a workplace violence restraining order. The parties shall each bear their own costs on appeal.

There is no change in judgment.

The petition for rehearing is denied.

BUCHANAN, Acting P. J.

Copies to: All parties

2

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NORTH COAST VILLAGE CONDOMINIUM ASSOCIATION, | D079455 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2021-00005317-CU-PT-NC) |
| NANCY PHILLIPS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, David G. Brown, Judge. Reversed and remanded.

Berding & Weil, Anne L. Rauch; Epsten, Pejman Kharrazian, for Plaintiff and Appellant.

Cage & Miles and John T. Sylvester for Defendant and Appellant.

INTRODUCTION

North Coast Village Condominium Association (the Association) filed a workplace violence restraining order petition pursuant to Code of Civil

Procedure, section 527.8[1] in support of its board president, Neil Anderson, and 46 other employees and board members seeking to restrain resident Nancy Phillips. At the conclusion of a three-day hearing, the trial court denied the Association's request. It then sua sponte and absent a request to amend the pleadings by either party, awarded Anderson a civil harassment restraining order pursuant to section 527.6 against Phillips "in the interest of judicial efficiency and conforming pleadings to proof." In so doing, it impliedly amended the pleadings to add Anderson as a party.

Phillips appealed, requesting that we reverse the order granting the civil harassment restraining order and enter judgment dismissing all restraining orders with prejudice. The Association filed a cross-appeal seeking reversal of the order denying the workplace violence restraining order. It also requested that we reverse and remand with instructions to enter a restraining order that includes stay-away orders. In particular, the Association requested the court (1) prohibit Phillips from entering the Association's management offices and board meetings, (2) restrict her interactions regarding Association business to written communications, and (3) prohibit her from harassing or assaulting Association employees with racial epithets.

We conclude the trial court abused its discretion by sua sponte amending the cause of action and petitioning party without adequate notice. Regarding the cross-appeal, we further conclude the trial court erred in interpreting and applying section 527.8. We therefore reverse the order and remand the matter for further proceedings.

---

[1] All further undesignated statutory references are to the Code of Civil Procedure.

2

FACTUAL AND PROCEDURAL BACKGROUND

The Association is a California nonprofit corporation with forty-two employees and five board members. The North Coast Village condominium complex includes approximately 550 condominium units, an on-sight management office, and a security office. Phillips and Anderson both own units within the community and Phillips previously served two terms on the Association's board of directors. Anderson is the current board president.

A. *Phillips' Behavior Toward the Prior General Manager, Joseph Valenti*

Joseph Valenti was the Association's general manager for twenty-four years before he retired early—due in part to the fact that dealing with Phillips was "too much"—and took on a consulting role. He first met Phillips in 2005 when she angrily confronted him for supporting a contractor she had reported to the contractor's licensing board.

In 2013, Phillips ran for a board position. In her campaign statement, she made allegations against Valenti, saying there were employees that did not exist on the payroll and that Valenti had hired his wife unbeknownst to the board and was paying her huge amounts of money under the table. Phillips was elected to the board. After serving her two-year term, Phillips ran again in 2015 using similar allegations of financial misconduct by Valenti. Although she lost in 2015, she regained her seat in 2016.

Phillips continued to make allegations, but according to Valenti, refused to provide proof and would respond to any requests for evidence by stating that it was an "inappropriate question." In around 2018, Phillips tried to persuade the board to remove Valenti and replace him with a management company. Together with the "continuous" allegations she made against him, and her "mean as a hornet" tone, this move made him fearful he would lose his job.

During an earlier incident in 2017, Phillips stormed into Valenti's office to complain that the ballot box outside his office was unlocked.  When he inquired about the problem, she called him an asshole, told him to "shut up," and then backed out of his office saying, "stop it, Joe; stop it; stop it" to, in his view, "create the illusion that [he] was harming her physically."  Phillips then told the employees outside to call the police and said they would be fired if they did not write letters about what Valenti allegedly did to her.

Valenti estimated that Phillips threatened to fire him over fifty times, including while she was on the board and was his boss.  He said he feared for his safety as a result because he was the sole provider for his wife.

B.    *Parking Garage Incident with Fidel Jiran*

Fidel Jiran is the security patrol supervisor of the condominium complex.  One morning six to eight years ago, Jiran noticed a car was halfway out of its parking spot and was concerned it might have rolled out.  He saw Phillips approaching and asked if it was her car.  She responded by asking if he was on a power high.  He said no and explained that if it was not her car, he needed to find the owner.

Jiran said Phillips then became "slightly irate," pointed her finger at him, and said, "What are you on, a fucking high?"  She then said "Listen, fucker," walked quickly towards him, and took a backhanded swipe at his facial area.  Jiran pulled his head backward to try to avoid her, but she knocked his baseball cap to the ground.  He told Phillips he considered it an assault, and he subsequently submitted a written statement about the incident to Valenti.

Jiran learned from another resident that Phillips was on the board and became concerned that he could lose his job.  For several months after the

4

incident, he was anxious but, although he continues to avoid confrontations with Phillips, he reported being "back to normal" now.

## C. *Phillips Shoves Jennifer Duren*

Jennifer Duren works as an administrative assistant and client relations specialist in the Association office. In July 2018, Phillips came into the office and asked to speak with Valenti. Duren went to Valenti's doorway to announce Phillips. Phillips then came up behind Duren and shoved her with both hands into Valenti's office. Duren said she was so dumfounded that she just went back to her desk, but she later reported the incident to Valenti. Duren is now cautious about interacting with Phillips and said she will turn around and go the other way if she sees Phillips on the property.

## D. *Racial Slurs Directed at Painters*

Jorge Mendez supervises the Association's painting department. On May 25, 2020, Mendez and a coworker, Amadeo Hernandez, were painting a garage. It was a holiday and Phillips got mad they were painting and asked what they were doing. Mendez explained that they were finishing up the job they had started before the holiday. Phillips responded, "You guys should not be here because maybe you guys are sick. You guys have COVID- 19 and you should go home or go back to Mexico." Mendez did not respond, but reported the incident to Valenti and said Phillips' comments made him feel sad.

On June 19, 2020, Mendez and Hernandez were painting the first-floor landing of two adjoining buildings. A security officer had posted signs indicating that they would be painting the floor so residents would have to use the stairs instead of the elevator. Phillips tried to use the elevator and they told her it was closed. She got angry and said, "You motherfuckers should go back to Mexico." Phillips then walked away, and Mendez reported

the incident to Valenti. He said he did not take any of Phillips' comments to be threats.

E. *Parking Garage Incident Involving Wendy Delgado and the Subsequent Investigation*

On June 5, 2020, condominium owner Wendy Delgado was in her unit. Her family was staying with her, and she had given her sister a fob to enter the underground parking garage. The fob did not work when her sister swiped it and Phillips, who had just gone through the gate, blocked the entrance with her car and would not allow the sister or the four or five cars behind her through. The sister called Delgado, who came down with another fob. Delgado asked Phillips to let them in, but she demanded to know their names and whether they lived on the property. She said Phillips was acting "[e]rratic, angry, [and] hateful" and called them "fucking Mexicans." Phillips then asked the man in the white truck behind the sister if he had a fob. When he responded that he did not because he was just there to aid his sister with a dead car battery, Phillips told the man, who appeared to be of Middle Eastern descent, to "go back to your country, terrorist." She then pointed to nearby landscapers and said, "you lazy Mexicans."

Delgado called the Association patrol and a guard came to the scene. Once Delgado was able to pull into the garage, she felt she could not get out of the car because Phillips was standing there staring at them with a hateful look. Patrol guard David Marco heard "animated voices" in the garage and went in to investigate. He spoke to both parties and then Delgado's family went home via the stairs while Phillips took the elevator.

Following the incident, the Association's current general manager, Kathleen Wright, consulted with counsel and then sent a letter to Phillips notifying her that her use of the alleged racial slurs would not be tolerated.

6

She also sent a letter to Delgado letting her know that the Association did not condone Phillips' behavior and would address it at a hearing. Wright then notified the board, and the board created an executive committee to conduct an investigation. She spoke to witnesses during the investigation and, in the process, learned about the prior incidents involving Jiran, Duren, Mendez, and Hernandez. Eventually, she spoke with almost all of the Association's employees and uncovered additional instances of verbal abuse and racial slurs by Phillips. She also learned that Phillips had threatened four employees that they could lose their jobs. Phillips did not participate in the investigation.

After completing its investigation, the board called Phillips to a hearing to discuss its findings. Phillips did not attend. The board then fined Phillips $50.00 for being a nuisance in the garage and temporarily suspended her privileges. Wright subsequently said that she is afraid Phillips will retaliate against her based on her involvement in the case.

F.      *Interactions Between Phillips and Anderson*

Anderson served in the military for 26 years before retiring and taking a job as the director of disaster preparedness with a local fire department. He first encountered Phillips at an executive committee meeting after they were both elected to the Association's board in 2016.

In August 2018, Anderson noticed an unfamiliar woman sitting on a wall just outside his unit for several hours. Anderson later took a shower and then put on underwear before running to answer his phone, which was ringing on the island inside his unit. After finishing the call, he realized the woman sitting outside was taking pictures of him, so he closed the blinds.

Nothing happened until November 2018, when the Oceanside Police Department called Anderson's office and asked him to come down to the

7

police station. Thinking it was work-related, he went to the station, only to be confronted with a photograph of himself in his underwear. The officer told him a complaint had been filed against him claiming he masturbated in front of the patio door to a little girl in the yard. At that point he realized the photograph must have come from the woman who sat outside his unit for hours. The fire chief then immediately fired Anderson from his job as the director of disaster preparedness.

Thereafter, the district attorney filed a misdemeanor lewd conduct charge against him. Anderson hired a criminal defense attorney and appeared in court. Phillips took the witness stand, but after she made clear that she did not take the photograph and was not there that day, the court eventually dismissed the criminal charges. As a result of the charges, Anderson lost his job, spent $10,000 on legal fees, and suffered significant stress.

Anderson said Phillips showed the photograph of him in his underwear to his fellow homeowners during open board meetings, called him a pedophile, and mailed a copy of the photograph to every homeowner in North Coast Village prior to the November 2018 election in which both Phillips and Anderson were seeking reelection. Anderson won reelection "in a landslide" and Phillips lost.

Phillips persisted in raising the issue. Wright recalled that the first time she met Phillips was when Phillips stood up at the 2019 annual Association meeting attended by many homeowners, displayed Anderson's photograph, and yelled about him being a pedophile. As a result of the disruption, the meeting was adjourned. Valenti testified that Phillips would show up at every board meeting after the criminal charges were filed and call Anderson a pedophile in front of all the homeowners. Prior to the 2020 board

8

elections, Phillips distributed a flyer stating, "the person exposing himself was not found to be innocent" and then directing anyone exposed to this individual's "lewd conduct" to report it to management, the police, and the district attorney.

After the criminal charges were dropped in 2018, Phillips began walking by Anderson's condominium daily, fists jammed in the pockets of her hoodie, muttering. On the morning of December 23, 2020, Anderson was sitting inside his unit having coffee with his fiancée. Phillips walked up to the edge of his patio holding her cell phone pointing at Anderson's patio door. He walked up to the partly open sliding door and said, "you're not welcome here; please leave," to which Phillips responded "show me your genitals. I want to see your genitals." Anderson recorded a video of the incident and Phillips' statement with his phone.

In response to the incident, Anderson said, "I was shocked. I was dumbfounded. I was angry. I was reminded yet again of these ridiculous claims against me that have now been perpetuated over a two-year period of time. [¶] I was somewhat traumatized . . . ." He called the security patrol and then 911.

On the morning of January 16, 2021, Anderson and his fiancée were again drinking coffee on the patio of his condominium when Phillips walked by with her hands shoved in the pockets of her hoodie, "menacingly staring" as she walked by. After she exited the Association property's gate about 60 feet away and out of Anderson's sight, she started yelling, "He's threatening me. He's going to hurt me. Please, someone stop him. Stop him immediately." Anderson's fiancée peeked around the bush and saw Phillips "talking to nobody" and then apparently calling law enforcement. In response, Anderson said he "just started giggling" because he was wondering

9

"what in the world is she doing now[?]"  When law enforcement officers came to interview him about Phillips' allegation that he was threatening her with grievous bodily harm, Anderson laughed and said, "You got to be kidding me. This is ridiculous."  Anderson said he did not feel threatened at that time and no arrests were made following this incident.

After that, Phillips continued to walk by his condominium almost every day—at least a hundred times according to Anderson—constantly muttering. This persisted even after the Association obtained a temporary workplace violence restraining order against her on February 4, 2021.  On one occasion, he heard Phillips say "you mother fucker, I'm going to get you if it's the last thing I do."  He said she appeared to be filming him as she walked by.

Anderson stated that he fears Phillips "every minute" because she is "unpredictable" and "erratic."  As a result of her conduct, he refuses to have his grandchildren over, and he sold his home of 23 years and moved to an undisclosed location within North Coast Village.  He said Phillips' conduct has impacted his health, resulting in considerably higher blood pressure and stress and three operations he believes to be a direct result of her intimidation.  He said all of his health conditions are stress related.

G.    *The Workplace Violence Restraining Order*

On February 4, 2021, the Association filed a petition for a workplace violence restraining order alleging that Phillips had been "harassing, stalking, and [ ] caus[ing] emotional injury to [the Association's] employees." The Association checked boxes on the form indicating Phillips had (1) "[a]ssaulted, battered, or stalked the employee" and (2) "[m]ade a credible threat of violence against the employee by making knowing or willful statements or engaging in a course of conduct that would place a reasonable person in fear for his or her safety or the safety of his or her immediate

10

family." Although Anderson is "the employee" designated, the Association attached declarations from multiple employees listed as additional protected persons. It also alleged that "Phillips has verbally assaulted the protected persons; she hit one employee and shoved another employee; she has been creating a hostile work environment for the employees and Association Board Members since 2018; [s]he has disrupted Board Meetings, and has been sending harassing messages by phone, mail, or [email], over a period of time."

The Association requested several forms of relief. It asked that Phillips be prohibited from engaging in any of the statutorily prohibited behavior set forth in section 527.8[2] regarding all the protected parties and be required to communicate with the Association's general manager only via email. It also sought a stay-away order of at least 30 yards from all the protected parties as well as Anderson's home, workplace, and vehicle. The stay-away order application further requested that Phillips not be allowed to enter the

---

[2] Section 527.8 provides: "(a) Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an order after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace, and, if appropriate, other employees at other workplaces of the employer. [¶] (b) For purposes of this section: [¶] (1) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an employee to or from the place of work; entering the workplace; following an employee during hours of employment; making telephone calls to an employee; or sending correspondence to an employee by any means, including, but not limited to, the use of the public or private mails, interoffice mail, facsimile, or computer email. [¶] (2) 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.8, subds. (a) & (b).)

11

Association's management office or patrol office. Finally, the Association sought to prohibit Phillips from attending any board meetings.

On February 4, 2021, the trial court issued a temporary workplace violence restraining order (TRO) prohibiting Phillips from harassing, making threats, or otherwise contacting the protected employees; coming within six feet of the protected employees; being within six feet of Anderson's home, workplace, or vehicle; and attending board meetings. The TRO also prevented her from entering the management or patrol offices and required that she communicate with the Association via email.

H.    *Phillips Violates the Temporary Restraining Order*

Police arrested Phillips on March 29, 2021, for violating the TRO after she approached and spoke with protected employees at the patrol office.

On April 3, 2021, Anderson filmed Phillips again walking by his unit with her phone facing him and he called the police because he believed filming him violated the TRO. After watching the video, officers arrested Phillips.

I.    *The Workplace Violence Restraining Order Hearing and Order*

On August 9, 2021, the trial court began a three-day hearing on the Association's requested workplace violence restraining order. During the direct examination of Anderson, the court inquired as to whether the grass outside Anderson's patio was a common area, in what ways the other employees listed as protected parties were threatened, what kind of sanctions were imposed on Phillips by the executive committee, and under what authority the penalties were imposed. Anderson attempted to answer the questions, but Association counsel explained that he intended to offer evidence as to the penalties via Wright's subsequent testimony.

12

Between the direct and cross-examination of Anderson, the court asked for details about the two instances when Phillips violated the TRO. While counsel was cross-examining Anderson, the court asked Anderson if he was an employee and whether Phillips was on public property during the April 3, 2021 incident. During cross-examination regarding the Delgado incident, the court asked Anderson whether Philips was on his property on December 23, 2020. The court acknowledged it was "jumping around" and apologized for "throwing everybody a curve ball."

While Valenti was testifying, the court responded to an earlier question by the Association's counsel and indicated he probably would not allow closing arguments. The court said it had already prepared 10 pages of its order and noted that "any appellate issues are going to . . . stick out with both of you [counsel] like a sore thumb."

On the final day of the hearing, Valenti concluded his testimony and then the Association's counsel began examining Wright. The court asked her by what authority she and the executive committee could investigate Phillips even though the court acknowledged the issue was "not all that relevant to what we are dealing with here." When the Association's counsel tried to clarify whether they should further address documents vesting the Association with such authority, the court said, "we are here on a workplace violence injunction or request thereof, and arguably we are *also* here on a civil harassment as an individual violation or at least that is how I am viewing it, even though it was not particularly pled in that situation." The court then expressed its concern about imposing an order that would impinge upon Phillips' constitutional right to travel and right to free speech. At that point, counsel for Phillips "strongly urge[d]" the court not to "expand this

13

request into a [section] 527.6[3] of the [C]ode of [C]ivil [P]rocedure, because the petition is [a] workplace violence [restraining order petition]." The court responded, "Sadly, [counsel], that is where I'm going." It went on to explain, "That is the petition we have, but I [believe] in the interest of legal efficiency, if nothing else, that I should be allowed to go outside of the pleadings, and with the exception of North Coast Condominium Association, deal with the individual petitioners in that regard."

The court reminded everyone before the lunch break that it was the last day of the hearing. After the lunch break, counsel for Phillips conducted her cross-examination of Wright. She then moved for a directed verdict on the workplace violence restraining order petition, which the court denied. The court then said it wanted to "lay some groundwork" for Phillips'

---

3    Section 527.6 provides: "(a)(1) A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order and an order after hearing prohibiting harassment as provided in this section. . . . [¶] (b) For purposes of this section, the following terms have the following meanings: [¶] (1) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not limited to, the use of public or private mails, interoffice mail, facsimile, or email. Constitutionally protected activity is not included within the meaning of 'course of conduct.' [¶] (2) 'Credible threat of violence' is a knowing and willful statement or course of conduct that would place a reasonable person in fear for the person's safety or the safety of the person's immediate family, and that serves no legitimate purpose. [¶] (3) 'Harassment' is unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subds. (a) & (b).)

14

testimony so they would conclude the matter on time, and it could read portions of the 13-page order it had already drafted. The court made clear that it was not interested in hearing about the incidents with Duren, Jiran, Mendez, or Delgado because they were not important for what it intended to do. Instead, the court asked counsel to focus on the December 23, 2020, and January 16, 2021 incidents involving Anderson, the issues Phillips had with the board members, Phillips' knowledge of the criminal action, where she was standing on December 23, 2020, and the comments she made to Valenti and at board meetings.

In trying to clarify the parameters the court was setting on her examination of Phillips, her attorney pointed out that they had spent three days hearing the Association's witnesses, and her client wanted an opportunity to respond during the final hours of the hearing.

After Phillips testified regarding the impact of the TRO on her life, the court apologized that the TRO was in effect much longer than it should have been due to pandemic-related delays.[4] Phillips asserted she was not on Anderson's patio on December 23, 2020, and was on a public sidewalk on January 16, 2021. Regarding the criminal charges, Phillips said the homeowner who made allegations against Anderson asked her for help and requested that she take the report to the police station. She viewed the restraining order as retaliation for cooperating with the district attorney in the criminal case against Anderson and for questioning the Association's financial practices. Phillips then denied having met most of the witnesses and said she never used racial slurs or shouted at anyone.

---

[4] The court subsequently stated that it did not think the TRO violations were important because the TRO was in place "far beyond any allowable statutory period."

15

After the Association's counsel cross-examined Phillips, the court said it would not allow closing arguments from either side. It then immediately read most of its prepared order into the record.

In its order, the trial court concluded that it had the ability to view the matter as a request for a civil harassment restraining order under section 527.6 instead of a workplace violence restraining order under section 527.8 "in the interest of judicial efficiency and conforming pleadings to proof." It then denied the petition under section 527.8 with prejudice. The court explained that, as to the other employees, the Association had not proven by clear and convincing evidence that there was a continuing course of conduct or that the individuals would suffer great and irreparable harm if the court did not restrain Phillips. As for Anderson, the court found as a matter of law that he was an employee of the Association. Assuming the Association was an employer for purposes of section 527.8, and in light of the limitation that the violence must "be reasonably construed to be carried out or, to have been carried out, at the employee's workplace[,]" the court concluded that on December 23, 2020, and January 16, 2021, there was "no clear and convincing evidence that [Phillips] engaged in a credible threat of violence or willful course of conduct within the actual physical boundaries [of the Association]." Further, because it found "no evidence that the activities relating to [Phillips'] course of conduct and credible threats of violence involve[d] the actual association location or the position of [Anderson] as a member of the board, the court treat[ed] the request [as one by Anderson as] an individual and not an employee of [the Association]."

The court did not find Phillips credible but said her statements at board meetings critical of Anderson and Valenti, including calling Anderson a pedophile, were made in connection with the management of the

16

homeowner's association and, therefore, were protected speech. As a result, it concluded the Association was "not a proper petitioner for purposes of restraint of [Phillips]." The court then addressed whether any of the other testifying witnesses—Duren, Jiran, Mendez, Hernandez, Marco, Delgado, or Valenti—were entitled to an individual restraining order under section 527.6. It concluded they were not.

The civil harassment restraining order the court issued under section 527.6 prohibited Phillips from going within 50 yards of Anderson. The court further ordered Phillips "not to contact, molest, harass, attack, strike, threaten, sexually assault, batter, telephone, send any messages to, follow, stalk, or destroy the personal property of Neil Anderson" or possess a firearm.

DISCUSSION[5]

I.

*The Trial Court Abused its Discretion by Sua Sponte Amending the Cause of Action and Petitioning Party Without Notice*

Phillips asserts three grounds supporting her argument that the trial court erred in reforming the pleadings. First, she contends it was improper for the trial court to impose a civil harassment restraining order—a remedy outside of the pleadings—when the Association never moved to amend. Second, Phillips highlights that the mandatory Judicial Council forms specific to section 527.6 were not used. Finally, because only an individual

---

[5]    Prior to completion of the briefing in this case, the parties filed a stipulation regarding Phillips' citation to the now de-published case of *Guan v. Hu* (2017) 12 Cal.App.5th 406 (*Guan*) in her opening brief. Having considered the stipulation and how the parties addressed the de-publication of *Guan* in their subsequent briefing, we find good cause to treat any citation to *Guan* in Phillips' opening brief as having been stricken.

17

may petition for a civil harassment restraining order under section 527.6, Phillips asserts the Association lacked standing to seek such a restraining order for Anderson.

Because the Association did not request to amend the pleadings, these arguments imply the trial court abused its discretion in sua sponte entering the civil harassment restraining order. Accordingly, resolution of this issue is fundamental to addressing Phillips' arguments on appeal.

A. *Legal Standard*

"It is well established that leave to amend a complaint is entrusted to the sound discretion of the trial court, and that the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse of discretion." (*McMillin v. Eare* (2021) 70 Cal.App.5th 893, 909 (*McMillin*).) This discretion extends to requests to amend both the causes of action and the parties. In particular, section 473 provides that "[t]he court may, in furtherance of justice, and on any terms as may be proper, allow a party to amend any pleading or proceeding by adding or striking out the name of any party . . . . The court may likewise, in its discretion, *after notice to the adverse party*, allow, upon any terms as may be just, an amendment to any pleading or proceeding in other particulars . . . ." (Code Civ. Proc., § 473, subd. (a)(1), italics added.) "[I]n ruling on a motion to amend a complaint to conform to proof, 'the court is usually guided by whether: [¶] . . . there is a *reasonable excuse* for the delay; [¶] . . . the change relates to the *facts* or only to legal theories; and [¶] . . . the opposing party will be *prejudiced* by the amendment.' " (*Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378–1379.) "Unfair surprise to the opposing party is also to be considered." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 297.) A trial court abuses its discretion only if it allows amendments to conform to proof that

18

introduce "new and substantially different issues" into the case or that prejudice the rights of the adverse party. (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31 (*Trafton*).)

Such amendments generally may occur "at any time before or after commencement of trial, in the furtherance of justice" (§ 576) so long as the amendments do not raise new issues against which the opposing party has had no opportunity to defend. (*Trafton, supra,* 69 Cal.2d at p. 31; *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 354–355.)

The trial court also "may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue." (§ 580, subd. (a).) Although it is fundamental that "the court may afford any form of relief supported by the evidence," it must also be relief "as to which the parties were *on notice*, whether requested in the pleadings or not." (*American Motorists Ins. Co. v. Cowan* (1982) 127 Cal.App.3d 875, 883, italics added (*American Motorists*).)

B.    *Analysis*

The challenge both the parties and this court face in applying existing legal precedent to this appeal is that the statutes and caselaw address motions by *parties* to amend the pleadings, but here neither party requested the amendments or relief afforded by the trial court. Because the trial court substituted one form of restraining order for another, a further confounding factor is that the case involves simultaneous amendments of both the cause of action and the remedy. Ultimately, resolution of this appeal requires us to evaluate where the line is properly drawn between judicial discretion to sua sponte amend the pleadings and craft corresponding relief, and the impacted party's due process right to notice of the allegations against them and a reasonable opportunity to defend.

19

The Association asserts that the trial court's authority to amend is well established. But the Association relies upon precedent discussing the court's authority to *allow* amendment and to do so earlier in the proceedings. Only in the cases of *McMillin v. Eare* (2021) 70 Cal.App.5th 893 (*McMillin*) and *Mac v. Minassian* (2022) 76 Cal.App.5th 510 (*Mac*) do we find guidance in addressing a trial court's sua sponte, post-trial amendment of the relevant pleadings. In *McMillin*, a wife, the husband she was in the process of divorcing, and the husband's mother disputed ownership of two parcels of real property. (*McMillin,* at p. 898.) One of the mother's claims at trial was for constructive trust. (*Id.* at p. 907.) Because constructive trust is a remedy, not a cause of action, the trial court sua sponte amended the mother's complaint to include a cause of action for breach of fiduciary duty. (*Ibid.*) However, it did not do so until its post-trial tentative statement of decision. (*Id.* at p. 908.) The court then found that the wife owed fiduciary duties to the mother and breached those duties on several occasions. (*Id.* at p. 907.)

On appeal, the wife argued the court had not simply renamed an existing cause of action with the amendment but created a new and different claim. (*McMillin, supra,* 70 Cal.App.5th at p. 908.) Because the facts asserted in the mother's complaint did not reasonably put her on notice of a potential breach of fiduciary duty claim, she argued she was prejudiced by the lack of opportunity "to respond, prepare, and defend, as she would have introduced additional evidence/testimony about whether she even owed a fiduciary duty, as well as a statute of limitations defense." (*Id.* at p. 909.)

In addressing the issue, the reviewing court focused on whether the amendment was supported by the alleged facts and legal theories pled in the complaint, such that the wife would reasonably have been put on notice of a claim for breach of fiduciary duty. (*McMillin, supra,* 70 Cal.App.5th at

p. 910.)  Finding neither the complaint nor the mother's evidence offered facts giving rise to the existence of any fiduciary relationship between the wife and mother, the court concluded:  "we find the trial court's sua sponte posttrial amendment of the third cause of action to one for breach of fiduciary duty prejudiced [wife]; it contravened basic tenets of law and motion practice (§ 1010; Cal. Rules of Court, rule 3.1110(a)) as well as [wife's] right to notice, which is an element of due process.  [Citation.]  'It is a fundamental concept of due process that a judgment against a defendant cannot be entered unless [she] was given proper notice and an opportunity to defend.'  [Citation.] ' "Due process requires that all parties be notified of the facts and issues in dispute, that each party be afforded a fair opportunity to present evidence in open court, and that judgment be rendered based on an evaluation of the evidence on each side, findings of fact and conclusions of law." '  [Citation.]  A court that rules on a material issue 'without even mentioning to the parties at the time that it was considering the question' violates due process." (*McMillin,* at pp. 912–913.)  The reviewing court therefore concluded that the trial court abused its discretion in sua sponte amending the complaint. (*Ibid*.)

In *Mac,* the Second District recently reached a similar conclusion when confronted with an analogously unusual situation.  There, the plaintiffs filed suit against an individual and his company for breach of contract and failure to repay money due under promissory notes.  (*Mac, supra,* 76 Cal.App.5th at p. 513.)  Pursuant to a stipulation the parties belatedly realized had never been signed by the court, one plaintiff filed a fourth amended complaint removing the individual defendant as a party.  (*Id*. at p. 514.)  The remaining defendant answered the fourth amended complaint and the parties proceeded with a two-day bench trial.  (*Id*. at pp. 514–515.)  The day after trial, the

21

plaintiff filed a motion for leave to file a fifth amended complaint, seeking to add back the individual defendant. (*Id.* at p. 515.). The trial court denied the motion stating, "[p]ermitting an amendment to add a defendant dismissed before trial when trial has now already been concluded can only be prejudicial to that defendant because there is no opportunity for the defendant to present a defense." (*Ibid.*) However, despite its ruling, the court then issued a statement of decision making findings against the individual defendant and entering a substantial judgment against him. (*Id.* at pp. 515–516.)

On appeal, the reviewing court concluded that adding the individual defendant back into the case after trial was "prejudicial to his due process rights." (*Mac, supra,* 76 Cal.App.5th at p. 519.) It noted that nothing during the trial put him on notice that the trial court viewed him as a party. (*Ibid.*) Further, the reviewing court stated that, had he known he could be held personally liable, the defendant may have conducted discovery, answered, brought motions, or participated in the trial as a defendant. (*Id.* at p. 520.) It explained that "California courts have denied leave to amend where the proposed amendment to the complaint is during or after trial, and the amendment would require the defendant to have litigated or acted differently to assert his rights before and at trial." (*Id.* at p. 519.) Noting that "the parties do not point to any case where a defendant was pled into a case posttrial without prejudice, and this court could find none," the reviewing court found the trial court had abused its discretion. (*Id.* at pp. 520–521.)

Assuming the trial court had discretion to sua sponte amend the pleadings in the present case, we conclude Phillips was similarly denied due process protections when the court did so at the conclusion of the case without prior notice. Similar to *Mac,* the fact that Anderson was not listed as

22

a party is a significant factual omission that deprived Phillips of notice that the court might amend the pleadings and enter a civil harassment restraining order against her.  A petition for a workplace violence restraining order may only be brought by an *employer* (§ 527.8, subd. (a)), whereas only a natural person may apply for a civil harassment restraining order. (*Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1258 (*Huntingdon*).)[6]  Thus, Phillips would not reasonably have anticipated the addition of a cause of action by Anderson or prepared accordingly.

This situation also is distinguishable from the cases cited by the Association where the real party in interest was substituted in to replace a plaintiff who lacked standing.  In those cases, the substitution allowed maintenance of the same claim of liability, of which the responding party already had notice, on the same facts.  (Cf. *Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 21 [authorizing administratrix of the estate of a deceased stockholder to substitute in "on behalf of the corporation to enforce against the defendants *exactly the same liability* which is the basis for the relief now

---

[6]     We acknowledge that within the context of an appeal of an order denying a defendant's special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute (§ 425.16), this court allowed a harassment claim under section 527.8 to proceed along with a section 527.6 claim even though the complaint did not specifically cite section 527.8.  (*Huntingdon, supra,* 129 Cal.App.4th at p. 1258.)  But the circumstances present in the *Huntingdon* case were materially distinguishable in two respects.  First, the employer entitled to bring the section 527.8 claim was already a party to the suit.  (*Ibid.*)  Second, we specifically noted that the complaint alleged facts giving rise to the cause of action under section 527.8 "and defendants d[id] not contend otherwise." (*Id.* at pp. 1258–1259.)  Neither is the case here.  Anderson was not a party to the suit and Phillips objected at the hearing and in her appellate briefing that the facts did not support a claim under section 527.6.

sought on behalf of the corporation" where the defendants had been on notice since the filing of the original complaint of the facts relied upon to state a right to relief on behalf of the corporation]; *Jensen v. Royal Pools* (1975) 48 Cal.App.3d 717, 720 [allowing individual condominium owners to replace condominium owners' association that lost standing after filing of the case in seeking to recover damages to common areas of a condominium under same facts]; *Powers v. Ashton* (1975) 45 Cal.App.3d 783, 786, 790 [requiring the trial court to grant leave to amend to substitute trustees for nontrustee administrator in pursuing the same claims under a collective bargaining agreement].) Here, the Association appeared to have standing to seek the workplace violence restraining order it sought. (See § 527.8, subd. (b)(3) [defining an "[e]mployer" as including a private corporation].) By substituting Anderson in for the Association, the court allowed a wholly different cause of action of which the original pleading did not provide notice.

The breadth of behavior subject to restriction under section 527.8 also is narrower than that covered by section 527.6, meaning the section 527.8 petition did not put Phillips on notice to engage in discovery of certain facts or prepare appropriate defenses. While "[s]ection 527.8 was enacted in 1994 to establish parallel provisions to section 527.6. . . . [and] was thus intended to enable employers to seek the same remedy for its employees as section 527.6 provides for natural persons"[7] (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333–334 (*Scripps Health*)), the statutes are not identical. As the trial court in this case acknowledged, section 527.8 is much narrower than section 527.6. (Cf. *City of Los Angeles v. Animal Defense League* (2006)

---

7    Likewise, "Section 527.6 was amended in 1998 to parallel the provisions of section 527.8 regarding the definitions of ' "[u]nlawful violence," ' ' "[c]redible threat of violence" ' and ' "[c]ourse of conduct." ' (Stats. 1998, ch. 581, § 2.)" (*Scripps Health, supra,* 72 Cal.App.4th at p. 333, fn. 7.)

135 Cal.App.4th 606, 627 (*City of Los Angeles*) ["the circumstances under which an individual may obtain a section 527.6 civil harassment restraining order are, in fact, broader than an employer's right to a workplace violence restraining order under section 527.8"]. Specifically, unlike section 527.8, section 527.6 allows restraint based upon harassment, defined as "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(3).) "The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (*Ibid.*) In preparing her defense and cross-examining Anderson, Phillips' counsel would not have had reason to focus on conduct which merely alarmed, annoyed, or harassed Anderson when the section 527.8 standard focused on unlawful violence and credible threats of violence that put Anderson in fear for his safety. The court did not put Phillips on notice that it was considering a civil harassment restraining order until after counsel for Phillips had cross-examined Anderson. This adversely impacted her ability to challenge testimony showing "substantial emotional distress," which differs in nature from fear for safety and "great or irreparable harm" as required by section 527.8.

These distinctions are material because, although a civil harassment restraining order can be based on unlawful violence or a credible threat of violence, which have identical definitions in both statutes, the trial court in this case based its decision on the lower harassment standard. Specifically, the court found "as to the incident[s] on December 23, 202[0] and in January 16, 2021 that [Phillips] engaged in with a continuity of purpose a willful course of conduct intending to vex, annoy or harass serving no legal purpose."

25

Furthermore, even though the trial court stated before the end of testimony on the last day of the hearing that it was also considering a restraining order under section 527.6, it did not issue a tentative ruling expressly denying the workplace violence restraining order or explaining its thinking such that the parties could effectively prepare. First it said, "we are here on a workplace violence injunction or request thereof, and arguably we are *also* here on a civil harassment as an individual violation or at least that is how I am viewing it, even though it was not particularly pled in that situation." (Italics added.) This gave counsel for Phillips some indication she should address a civil harassment restraining order without sufficient notice, but also suggested she should use some of the limited time the court afforded her to defend against the workplace violence restraining order. Then, the trial court further obscured its intended ruling by denying Phillips' motion for a directed verdict. This suggested the court found some merit to the workplace violence restraining order petition. The court then stated that it did not intend to explain its reasoning until after the hearing, commenting "I do believe that may be an issue for appellate review, but I will explain that all when I get to my ruling." In other words, although the parties had some indication on the last day of the hearing that the court was *considering* amending the complaint, as in *McMillin*, the court did not actually sua sponte amend the complaint until after conclusion of the trial. (*McMillin, supra,* 70 Cal.App.5th at p. 910.)

Accordingly, we conclude the same due process concerns raised in *McMillin* and *Mac* apply here. Even though the proceeding for obtaining a civil harassment restraining order is not intended to be a full trial on the merits, the hearing "provides the only forum the defendant in a harassment proceeding will have to present his or her case." (*Schraer v. Berkeley Property*

*Owners' Assn.* (1989) 207 Cal.App.3d 719, 732–733.)  Thus, the defendant's due process rights are infringed when the defendant's right to present evidence and cross-examine witnesses is unduly limited.  (See *id.* at p. 733.)

Had the Association sought to amend the complaint after the hearing concluded, statutory authority likely would have mandated denying the request because of the lack of pre-hearing notice to Phillips.  (See § 473, subd. (a)(1) [allowing amendment to any pleading or proceeding, in the court's discretion, *after notice to the adverse party* and upon just terms]; *American Motorists, supra,* 127 Cal.App.3d at p. 883 [recognizing that the trial court has authority under section 580 to afford any form of relief supported by the evidence *if* the parties had notice of the potential form of relief before the proceeding].)  We see no reason to conclude differently where the court makes the amendments sua sponte.

While we appreciate the trial court's effort to promote judicial efficiency, particularly where it was mindful that pandemic delays had resulted in the TRO remaining in effect far longer than the maximum of 25 days authorized by section 527.8 (see § 527.8, subds. (g) & (h)), we conclude the lack of sufficient notice of the facts and legal issues in dispute deprived Phillips of her due process rights.

Because Phillips did not have adequate notice of the amendments to the named parties, cause of action, or remedy until the court issued its ruling after the hearing, she was unfairly prejudiced in her ability to defend her interests.  (See *McMillin, supra,* 70 Cal.App.5th at pp. 913–914.)  Accordingly, we conclude the court abused its discretion in granting a civil harassment restraining order in favor of Anderson.[8]

---

[8]    Because we conclude the court's abuse of discretion warrants reversal, we need not address Phillips' remaining arguments on appeal.

## II.

*The Trial Court Erred in Interpreting and Applying Section 527.8*

On cross-appeal, the Association argues the trial court misinterpreted and misapplied section 527.8.  It contends the trial court erred in concluding that section 527.8 did not apply to the December 23, 2020, and January 16, 2021 incidents because (1) Phillips was standing on public versus Association property, and (2) Anderson was not acting in his official capacity as a board member at the time of the incidents.

We independently review claims challenging a trial court's construction of a statute.  (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)  Likewise, in reviewing mixed questions of law and fact where we must address whether the lower court properly applied the rule to the facts, if "the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271.)

We turn first to whether section 527.8 supports the distinction drawn by the court regarding where Phillips was standing on December 23, 2020, and January 16, 2021.  " 'Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose.  [Citation.]  We must look to the statute's words and give them "their usual and ordinary meaning."  [Citation.]  "The statute's plain meaning controls the court's interpretation unless its words are ambiguous."  [Citations.]  "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy."  [Citation.]' " (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527.)  Section 527.8 allows an employer

28

to seek a workplace violence restraining order protecting an employee who "suffered unlawful violence or a credible threat of violence" that can reasonably be construed to "have been carried out at the workplace." (§ 527.8, subd. (a).) And, if as here a course of conduct is alleged, it includes conduct "evidencing a continuity of purpose, including following or stalking an employee *to or from the place* of work; entering the workplace; [and] *following an employee during hours of employment . . . .*" (§ 527.8, subd. (b)(1), italics added.) These provisions imply that while the conduct need not have occurred at the actual workplace, it must at least have occurred on the way to or from the workplace or during work hours.

In this case, Anderson testified that he considers his home to be his office, and he will respond to Association needs 24 hours a day if he is needed. He also testified residents approach him in the community to ask him questions or talk to him "all the time" and at all different hours. When asked "Do staff or management call you at various times to discuss association business with you?" he replied, "[a]ll the time" and indicated that the calls are "[o]ften after work hours." Within this context, the plain language of the statute appears to encompass Phillips' stalking or threatening of Anderson at his home and at all hours because his home was also his workplace, and he did not have a set work schedule.

But some ambiguity remains as to whether the definition of "workplace" includes a home office when the individual is not actively engaged in work at the time. The parties did not provide any authority defining the parameters of the workplace and we have found only one case addressing the issue. In *City of Los Angeles, supra,* 135 Cal.App.4th at pages 606, 610, 626, animal rights activists protested at a city employee's home and displayed red targets and bullet holes next to his name in online postings.

29

The court concluded that because the internet postings contained the employee's home address, not his office address, the perceived threats of violence could not reasonably be construed as threats that would be carried out at the workplace. In so doing, the court noted that in the original version of Assembly Bill No. 68X (1993–1994 First Ex. Sess.), which was introduced on February 18, 1994 and added section 527.8, the legislature "permitted an employer to obtain a restraining order if its employee suffered from harassment 'in conjunction with or stemming from his or her employment.' " (*City of Los Angeles,* supra, 135 Cal.App.4th at p. 626, fn. 18.) But that expansive language was deleted a few months later in subsequent bill drafts. (*Ibid.*)

The bill's author explained that "[t]he purpose of this bill is to protect employees from violence *in the workplace,*" (italics added.), it "provides employers another weapon by which they may attempt to combat workplace violence," and it creates a provision "employers could use to seek injunctive relief on behalf of employees who are exposed to violence or threats *in the workplace*" (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 68X (1993–1994 First Ex. Sess.) as amended June 30, 1994, italics added.) Accordingly, it appears the legislature intentionally narrowed the scope of the statute to violence or threats of violence occurring in or near the physical workplace, as opposed to those stemming from the individual's employment.

But this does not definitively resolve the issue and we find nothing else in the legislative history or caselaw that provides clear guidance as to whether section 527.8 encompasses protection for those who *live* at their workplace. In a day and age when a large portion of the workforce works from home, the line between the workplace and home has become increasingly blurred. The boundary also is not clear regarding the trial

court's other distinction between whether Anderson was acting as an employee at the relevant times or not. Now that many employees have the ability to work from anywhere and even on their phones, employees may alternate between handling personal and work matters throughout the day and night and follow a less defined work schedule than in the past. As a result, the distinction between when someone is and is not functioning as an employee may not always be abundantly clear. To be sure, the trial judge faced the difficult exercise of trying to apply section 527.8 in this context. And this opinion should not be read to unequivocally hold that section 527.8 applies to all actions involving board members or employees who live at their workplace and maintain irregular hours. Ultimately, how this statute is applied in an evolving work environment likely is an issue the legislature will need to revisit. We conclude only that the limitations imposed by the trial court in this case are not supported by the language or history of the statute.

Specifically, Anderson's testimony suggests that drawing a line between whether Phillips was standing on the grass or the patio represented a distinction without a difference, given the statute's overall purpose of allowing employers a means to protect their employees from harm. (*USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 443 ["The express intent of the author of the legislation was to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such acts of workplace violence"].) Anderson testified he was only "85 percent [sure] she was standing on [his] patio" but it "felt like she was standing on [his] property" because "[s]he was just so close and so large in her demeanor that . . . it was scary." Anderson said he felt in fear for his safety, and we see nothing in section 527.8 suggesting an intent to allow the Association to protect him if Phillips moved one foot forward, but

not if she moved one foot back. Furthermore, even if the grass was unequivocally public property[9], the statute covers "following or stalking an employee *to or from the place* of work," which would seem to sufficiently encompass Phillips being inches off "workplace" property.

We also question the legal and factual basis for the court's conclusion that "the behavior of [Phillips] was not associated with [Anderson's] employment as a member of the Board of Directors." Anderson only knew Phillips from their service together on the board. No evidence suggested they formed a social relationship prior to or during their time on the board or encountered each other as neighbors. To the contrary, they only crossed paths outside of board meetings because Phillips intentionally walked past his unit on a near daily basis. As the court acknowledged, "she clearly was tracking him down." The evidence showed she used photographs and criminal reports she obtained to further her goal of having him removed from the board. Thus, substantial evidence does not support a conclusion that she had a reason for targeting him that was not based on his employment as a board member.

The more pertinent legal question is whether, as perhaps the court meant, section 527.8 covered her actions if she targeted Anderson at a time when he did not happen to be engaged in Association work. As we indicated previously, this is a decision better left to the legislature. But if, for example, the employee worked in a more traditional workplace setting such as a corporate office, and an individual routinely followed the employee to and from the office, but happened to make a credible threat of violence while the employee was taking a coffee break in the office kitchen, we find nothing in

---

9      The trial court noted that the evidence was conflicting as to whether the grassy area outside Anderson's patio was public or Association property.

the statute or history that would prohibit the employer from seeking a workplace violence restraining order to protect the employee. Particularly when the court found that everything Phillips said and did within the context of actual board meetings was protected speech, drawing the line based on what Anderson was doing at the moment when he was outside of meetings left the Association without a way to protect its employee.

If we remove the qualifiers regarding where Phillips was standing and in what capacity Anderson was functioning at the time, we unfortunately cannot evaluate whether the trial court's finding regarding whether Phillips made a credible threat is supported by substantial evidence because it is not clear if the court made such a finding. The trial court's statements regarding whether Phillips made a credible threat of violence appear conflicting. First the court said: "[regarding] the two incidents upon which the court is basing the restraining order i.e., December 23, 2020 and January 16, 2021 the court finds no clear and convincing evidence that respondent engaged in a credible threat of violence or willful course of conduct *within the actual physical boundaries of [the Association]*." (Italics added.) If we remove the limitations regarding where Phillips was standing at the time of the incidents ("within the actual physical boundaries of [the Association]"), it is not clear if the court found that Phillips made a credible threat or not. The court then stated: "There is no evidence that the activities relating to [Phillips'] course of conduct and credible threats of violence *involve the actual association location or the position of [Anderson] as a member of the board*." (Italics added.) This suggests the court did find that Phillips made a credible threat of violence, even if we disregard the location and status limitations. Finally, the court concluded: "the testimony shows that the behavior of [Phillips] was not associated with [Anderson's] employment as a member of the Board of

33

Directors.  On the same note, [Phillips'] behavior did not involve violence and credible threats of violence towards an employee as is required by Code of Civil Procedure [section 527.8]."  Since the court found as a matter of law that Anderson was an employee of the Association, this third statement seems to state that even if she made credible threats of violence, they did not fall under the statute because Anderson was not acting in his capacity as an employee at the time.  Absent the capacity qualifier, the finding is unclear.  In sum, because these ambiguous statements do not provide a sufficient record that would allow us to determine the court's holding absent the added limitations regarding location and capacity, remand is appropriate.[10]

For the foregoing reasons, we reverse the order denying the Association's workplace violence restraining order petition and remand to the trial court.  We express no opinion as to how the petition should be resolved.

[10]    The Association also contends the trial court erred in refusing to consider Phillips' conduct against the Association's management, maintenance, and patrol staff, collectively, as demonstrating a course of conduct under section 527.8.  It further requests that we reverse and remand with instructions to enter a restraining order that includes stay-away orders.  Because these issues are inextricably interwoven with the court's denial of the workplace violence restraining order, the trial court may consider on remand whether it is appropriate to revisit its decision as to these parties in light of this opinion.

34

## DISPOSITION

The judgment is reversed and remanded.  The parties shall each bear their own costs on appeal.

CASTILLO, J.

WE CONCUR:


BUCHANAN, Acting P. J.


KELETY, J.